**LSK&D #: 564-8008 / 1032194**
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

SERGIO PAVON,

                                    No. 08 cv 1272 (PAC)

                        Plaintiff,

        -against-                   **AFFIDAVIT OF DEBRA
                                    BLOODGOOD**

METROPOLITAN LIFE INSURANCE
COMPANY and NOVARTIS CORPORATION,

                        Defendants.
-------------------------------------------------------------x

STATE OF NEW JERSEY         )
                            )ss.:
COUNTY OF MORRIS            )

        I, Debra Bloodgood, depose and state as follows:

        1.      I am employed by Novartis Pharmaceuticals Corporation ("NPC") as Manager, Employee Benefits.  I make this Affidavit in support of Defendants' Opposition to Plaintiff's Cross-Motion to Remand in the above-captioned action.

        2.      As part of my job responsibilities, I am familiar with the documents governing the NPC Welfare Benefits Plan (the "NPC Plan").  I am also familiar with the human resources information system of NPC.

        3.      Attached hereto as Exhibit "A" is a true and correct copy of the plan document for the NPC Plan, effective January 1, 2005 and amended through 2007, including the general provisions of the NPC Plan, a freestanding amendment thereto and Supplement D relating to disability benefits.  The NPC Disability Plan and the NPC Medical Plan are components of the NPC Plan.  (See Ex. A, Plan Document, p. 1.)

4.    Mr. Sergio Pavon was an employee of NPC.  He received, and continues to receive, certain disability and medical benefits under the NPC Plan.

_Debra Bloodgood_

DEBRA BLOODGOOD

Sworn to and subscribed before
me this 12 day of June, 2008

_Laurie A. Bras_

Notary Public

2

**EXHIBIT "A" TO BLOODGOOD AFF.**

# NOVARTIS PHARMACEUTICALS CORPORATION

## WELFARE BENEFITS PLAN

including supplements covering:

Medical Benefits (including Retiree Medical)

Post-Employment Survivor Coverage

Dental Benefits

Vision Benefits

Life Insurance Benefits

Long-Term Disability Benefits

Legal Assistance Benefits

Health Care Spending Account

Dependent Care Spending Account

Group Long Term Care Insurance Benefits

**Amended and Restated**
**Effective January 1, 2005**

# TABLE OF CONTENTS

**Page**

ARTICLE 1     GENERAL ............................................................................................. 1

    1.1     Establishment ............................................................................................. 1
    1.2     Purpose ....................................................................................................... 1
    1.3     Plan Supplements ...................................................................................... 1
    1.4     Effective Date ............................................................................................ 1

ARTICLE 2     DEFINITIONS ...................................................................................... 2

    2.1     Definitions .................................................................................................. 2
    2.2     Controlling Authority ............................................................................... 6
    2.3     Gender and Number .................................................................................. 6

ARTICLE 3     PARTICIPATION AND ELIGIBILITY ......................................... 7

    3.1     Commencement of Participation .............................................................. 7
    3.2     Benefit Eligibility ..................................................................................... 7
    3.3     Participation Conditions ........................................................................... 7
    3.4     Termination of Participation .................................................................... 7
    3.5     COBRA Continuation Coverage ............................................................. 8

ARTICLE 4     RETIREE MEDICAL PLAN AND POST-EMPLOYMENT SURVIVOR
                COVERAGE ........................................................................................ 10

    4.1     Eligibility ................................................................................................. 10
    4.2     Medical Plan ............................................................................................ 10
    4.3     Cost Sharing for Grandfathered Eligible Retirees .............................. 10
    4.4     Cost-Sharing for Eligible Retirees who Terminate Prior to May 1, 2003 .......... 10
    4.5     Cost Sharing for Eligible Retirees who are not Grandfathered Eligible
           Retirees .................................................................................................... 11
    4.6     Retiree Medical Benefits for Individuals who Retired prior to January 1,
           2000 ........................................................................................................... 12
    4.7     Post-Employment Survivor Coverage .................................................. 12

ARTICLE 5     BENEFIT ELECTIONS AND PREMIUM CONTRIBUTIONS ...................... 13

    5.1     Flexible Contributions ............................................................................ 13
    5.2     Benefit Selections ................................................................................... 13
    5.3     Time of Election ...................................................................................... 14
    5.4     Application to Participate ....................................................................... 14
    5.5     Default Elections ..................................................................................... 15
    5.6     Irrevocability of Election ....................................................................... 15
    5.7     Limitations on Flexible Contributions ................................................. 16
    5.8     Accounts for Convenience of Employer ............................................... 16
    5.9     Refund or Carry-Over ............................................................................ 16

ARTICLE 6     HEALTH CARE REIMBURSEMENT PLAN ................................... 17

    6.1     Health Care Spending Accounts ............................................................ 17
    6.2     Increases in Health Care Spending Accounts ...................................... 17
    6.3     Decreases in Health Care Spending Accounts ..................................... 17

i

# TABLE OF CONTENTS
(continued)

Page

|  |  |  |
|---|---|---|
| 6.4 | Health Care Benefits | 17 |
| 6.5 | Limitations on Health Care Reimbursement Benefits | 18 |
| 6.6 | Forfeiture of Unused Benefits | 18 |
| 6.7 | Separate Written Plan | 18 |
| ARTICLE 7 | DEPENDENT CARE REIMBURSEMENT PLAN | 19 |
| 7.1 | Dependent Care Spending Accounts | 19 |
| 7.2 | Increases in Dependent Care Accounts | 19 |
| 7.3 | Decreases in Dependent Care Spending Accounts | 19 |
| 7.4 | Dependent Care Benefits | 19 |
| 7.5 | Limitation on Contributions and Benefits | 20 |
| 7.6 | Forfeiture of Unused Benefits | 20 |
| 7.7 | Annual Statement of Benefits | 20 |
| 7.8 | Separate Written Plan | 20 |
| ARTICLE 8 | PLAN ADMINISTRATION | 21 |
| 8.1 | Administration of Plan | 21 |
| 8.2 | Rules and Procedures | 22 |
| 8.3 | Claims Procedure | 22 |
| 8.4 | Actions of the Plan Administrator | 29 |
| 8.5 | Delegation | 29 |
| 8.6 | Reliance on Experts | 29 |
| 8.7 | Reports and Records | 29 |
| 8.8 | Finances | 29 |
| 8.9 | HIPAA Compliance | 29 |
| ARTICLE 9 | AMENDMENTS AND TERMINATION | 32 |
| 9.1 | Amendments | 32 |
| 9.2 | Benefits Provided Through Third Parties | 32 |
| 9.3 | Termination | 32 |
| ARTICLE 10 | LIMITATIONS AND LIABILITIES | 33 |
| 10.1 | Non-guarantee of Employment | 33 |
| 10.2 | Non-alienation of Assets and Benefits | 33 |
| 10.3 | Qualified Medical Child Support Orders | 33 |
| 10.4 | Limitation of Liability | 33 |
| 10.5 | Indemnification | 33 |
| 10.6 | Subrogation, Reimbursement, and Recovery for Third Party Liability Expenses | 34 |
| 10.7 | Applicable Law | 36 |
| ARTICLE 11 | FUNDING | 37 |
| 11.1 | Funding | 37 |
| ARTICLE 12 | AFFILIATES | 38 |

ii

**TABLE OF CONTENTS**
(continued)

Page

12.1   Adoption of the Plan ....................................................................... 38
12.2   Withdrawal of an Employer .............................................................. 38
12.3   Obligation of Employers ................................................................. 38
12.4   Cooperation by Each Employer ....................................................... 38
SUPPLEMENT A ........................................................................................... 1
SUPPLEMENT B ........................................................................................... 1
SUPPLEMENT C ........................................................................................... 1
SUPPLEMENT D ........................................................................................... 1
SUPPLEMENT E ........................................................................................... 1
SUPPLEMENT F ........................................................................................... 1
SUPPLEMENT G ........................................................................................... 1
SUPPLEMENT H ........................................................................................... 1

CHICAGO/#1050073.3

**ARTICLE 1**

**GENERAL**

1.1     <u>Establishment</u>.     NOVARTIS PHARMACEUTICALS CORPORATION (the "Company") intends to continue to sponsor a welfare benefits plan to be known as the NOVARTIS PHARMACEUTICALS CORPORATION WELFARE BENEFITS PLAN (the "Plan"), as set forth in this document. The Plan is intended to qualify as a "cafeteria plan" within the meaning of Code Section 125 and to comply with the provisions of Code Sections 105, 106 and 129, and shall constitute a "welfare benefit plan" within the meaning of ERISA Section 3(3).

1.2     <u>Purpose</u>.     The Plan shall provide for the administration of a plan of flexible benefits for the benefit of Eligible Employees and Eligible Retirees of the Company and adopting Affiliates that includes a comprehensive selection of employee welfare benefit plans, including, but not limited to, medical, dental, vision, life, long-term disability and legal assistance benefits in accordance with the applicable provisions of the Internal Revenue Code of 1986, as amended, and the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended. The Plan shall provide Eligible Employees with (i) a choice among a selection of welfare benefits; and (ii) the ability to pay with pre-tax dollars the Employee's cost of coverage for certain benefits selected by the Employee for himself/herself and his/her Dependents under such benefits.

1.3     <u>Plan Supplements</u>.     The provisions of the Plan shall include and may be modified from time to time by the adoption of one or more Supplements, as attached hereto.

1.4     <u>Effective Date</u>.     The Plan, as amended and restated, shall become effective as of January 1, 2005. Unless specifically provided otherwise, only those Eligible Employees who are actively employed by the Company or an adopting Affiliate on or after the Effective Date shall be eligible for benefits under this Plan.

## ARTICLE 2

### DEFINITIONS

    2.1    <u>Definitions</u>.   Each term defined herein shall be given its defined meaning wherever used in this document, unless the context requires otherwise.

    "<u>Affiliate</u>" means an entity (other than the Company) that is part of a group of entities which includes the Company and which constitutes: (a) a controlled group of corporations (as defined in Section 414(b) of the Code); (b) a group of trades or businesses, whether or not incorporated, under common control (as defined in Section 414(c) of the Code); or (c) an affiliated service group (within the meaning of Section 414(m) and (o) of the Code).

    "<u>Anticipated Health Care Contribution</u>" means the total Flexible Contribution anticipated to be contributed to the Participant's Health Care Spending Account during the current Period of Coverage based on the Participant's current benefit election pursuant to Section 4.1.

    "<u>Claims Administrator</u>" means the person or entity designated by the Plan Administrator to provide various services in connection with the administration of the Plan or any component thereof.

    "<u>Code</u>" means the Internal Revenue Code of 1986, as amended from time to time.

    "<u>Committee</u>" means the Novartis Pharmaceuticals Corporation Benefits Committee.

    "<u>Company</u>" means Novartis Pharmaceuticals Corporation.

    "<u>Compensation</u>" is the Participant's total compensation for the Plan Year, and prior to any reduction for purposes of making contributions on a pre-tax basis to benefit plans of an Employer meeting the requirements of Code Section 125 or 401(k), but excluding deferred compensation, stock options, benefit credits (or waiver credits) under a cafeteria plan, imputed income, insurance benefits, severance payments, tuition refunds, relocation or other expense allowance payments, suggestion or recruitment awards, long-term incentive plan payments, any other welfare benefits and fringe benefits, and such other special payments as determined by the Benefits Committee in a uniform and nondiscriminatory manner.

    "<u>Contribution</u>" means the portion of a Participant's Compensation that he/she has elected to reduce or redirect in order to provide the benefits described herein. A Participant's Contribution shall include the Participant's "Premium Contribution" and his/her "Flexible Contribution."

    (1)    "<u>Premium Contribution</u>" means the portion of a Participant's Compensation that he/she has elected to reduce, or is required to be used, to pay his/her portion of the cost of the coverage provided to him/her and to his/her dependents under any Employer program providing insurance coverage for such Employees.

(2)    "Flexible Contribution" means the portion of a Participant's Compensation that he/she has elected to reduce to provide coverage for Health Care Expenses and/or Dependent Care Expenses.

"Dental Plan" means the provisions of the Plan relating to the reimbursement of expenses for dental care and treatment as set forth in the applicable Supplement.

"Dependent" means an individual who qualifies as a dependent of a Participant under the terms of Code Section 152. Where appropriate in the context, "Dependent" shall include the Participant's Spouse, Domestic Partner, biological and legally adopted children, children placed with the Participant for adoption, step children who live with the Participant, children in the Participant's legal custody who live permanently in the Participant's household and children of the Participant's Domestic Partner who live with the Participant and his/her Domestic Partner, provided such individuals are dependents of the Participant under Code Section 152. Notwithstanding the foregoing, the term dependent includes any unmarried child of the Participant under age 24 if such child is a full-time student at an accredited school. The Plan Administrator may require that the proof of the child's age and status as a student be submitted periodically. The term "Dependent" will also include a child who has been insured as a dependent and who, upon reaching his/her 19th birthday, is incapable of self-sustaining employment by reason of mental or physical handicap and is claimed by the Participant as a dependent on his/her Federal income tax return. Coverage will continue past the 19th birthday if the Participant provides proof of continuous incapacity and dependency within 31 days of the child's 19th birthday, and periodically thereafter.

"Dependent Care Spending Account" shall mean the account established for a Participant to record the Flexible Contributions which the Participant has elected to be made to such account and the reimbursements made to such Participant for Dependent Care Expenses.

"Dependent Care Expense" means an amount paid for expenses of a Participant for household services or for the care of a Qualifying Individual, to the extent that such Expenses are (1) incurred to enable the Participant to be gainfully employed by an Employer, or (2) to enroll as a full-time student at an educational institution, for any period for which there are 1 or more Qualifying Individuals with respect to such Participant; provided, however, that (i) if such amounts are paid for expenses incurred outside the Participant's household, they shall constitute Dependent Care Expenses only if incurred either for a Qualifying Individual who is a Dependent under the age of 13, or for a Qualifying Individual who regularly spends at least 8 hours per day in the Participant's household; and (ii) if the expense is incurred outside the Participant's home at a facility that provides care for more than 6 individuals who do not regularly reside at the facility, the facility must comply with all applicable state and local laws and regulations, including licensing requirements, if any; and (iii) Dependent Care Expenses of a Participant shall not include expenses paid or incurred for services provided by a child of such Participant who is under the age of 19 or an individual who is a Dependent for whom the Participant or the Participant's spouse is entitled to an exemption under Code Section 151(c). In no event shall Dependent Care Expenses for any Period of Coverage exceed $5,000.

"Domestic Partner" means an individual other than a Spouse who is in a committed relationship with the Eligible Employee and who meeting the following criteria:

3

(a)     the Eligible Employee and the Domestic Partner are at least 18 years of age and mentally competent to consent to contract;

(b)     neither partner is married nor has another Domestic Partner;

(c)     the Eligible Employee and Domestic Partner have an exclusive mutual commitment similar to that of marriage;

(d)     the partners have been in a committed relationship for at least 12 consecutive months;

(e)     the Eligible Employee and the Domestic Partner are jointly responsible for each other's common welfare and share financial obligations;

(f)     the Eligible Employee and the Domestic Partner reside together in the same residence; and

(e)     neither partner is a blood relative of the other.

"Earned Income" shall mean all income derived from wages, salaries, and other employee compensation received by a Participant or his/her Spouse, plus net earnings from self-employment (within the meaning of Code Section 1402(a)), but, determined without regard to the deduction allowed by Code Section 164(f), received by a Participant or his/her Spouse. In the case of a Spouse of a Participant, during any month such Spouse is either a full-time student at an educational institution, or is physically or mentally incapable of caring for himself/herself, such Spouse will be deemed to have income of $200 if the Participant has one Dependent for the Plan Year, or $400 if the Participant has two or more Dependents for the Plan Year.

"Effective Date" means January 1, 2005.

"Eligible Employee" means, except as otherwise provided in an applicable Supplement, any individual who is regularly employed by an Employer on a United States payroll, other than: (a) a member of a collective bargaining unit; (b) an Employee regularly scheduled to work less than 20 hours per week; (c) a Leased Employee; (d) an individual who is employed on a temporary, casual or seasonal basis, as determined by the Employer; (e) an individual providing services to an Employer in the capacity of, or who is designated by the Employer in its sole discretion as, an independent contractor; (f) a nonresident alien not receiving United States source income; and (g) a temporary transfer from a non-United States Affiliate, who is not eligible for host country benefits under Novartis AG's international transfer policy.

"Employer" means the Company or any Affiliate that has adopted the Plan or a portion thereof.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"Health Care Expenses" means expenses paid for medical care of the Employee, his/her Spouse or Dependents, as defined in Section 213(d) of the Code, and shall include, but not be

4

limited to, payments for the purpose of affecting any structure or function of the body, for any hospital or nursing charges, optometrical, ophthalmological, or auditory care, dental care, psychiatric care, prescription drugs, insulin, eyeglasses, hearing aid appliances, and similar prosthetic devices, medical-related transportation expenses.

"Health Care Spending Account" means the account established and maintained for a Participant to record the Flexible Contributions that the Participant has elected to be made to such account and the reimbursements made to such Participant for Medical Expenses.

"Life Insurance Plan" means the provisions of the Plan relating to the provision of employee life insurance as set forth in the applicable Supplement(s).

"Long-Term Care Plan" means the provisions of the Plan relating to the provision of long term care insurance as set forth in the applicable Supplement(s).

"Long-Term Disability Plan" means the provisions of the Plan relating to the provision of long-term disability insurance as set forth in the applicable Supplement(s).

"Medical Plan" means the provisions of the Plan relating to the reimbursement of expenses for medical care and treatment as set forth in the applicable Supplement(s).

"Open Enrollment Period" means with respect to each Plan Year, the period prior to the first day of such Plan Year established by the Plan Administrator as the period during which Participants shall make elections with respect to eligible benefits during such Plan Year.

"Participant" means an Eligible Employee who satisfies the participation conditions of Article 3 on or after the Effective Date. A person who becomes a Participant shall remain a Participant until he/she terminates participation under the provisions of Section 3.4.

"Period of Coverage" means a year commencing January 1 and ending on the subsequent December 31; provided that, for any Employee who becomes a Participant after the start of a Plan Year, the Period of Coverage shall mean the period commencing on the date such Employee becomes a Participant and ending on the subsequent December 31.

"Plan" means the Novartis Pharmaceuticals Corporation Welfare Benefits Plan, as set forth herein and as amended or restated from time to time.

"Plan Administrator" means the Novartis Pharmaceuticals Corporation Benefits Committee, or such other person or entity designated in any Supplement to administer the Supplement and be the named fiduciary thereof.

"Plan Year" means the 12-month period beginning each January 1 and ending on the subsequent December 31.

"Qualifying Individual" means (a) a Dependent of a Participant who is under the age of 13, with respect to whom the Participant is entitled to an exemption under Section 151(c) of the Code, and (b) a dependent within the meaning of Section 152 of the Code or the Spouse of a Participant who is physically or mentally incapable of caring for himself/herself; provided,

5

however, that if paragraph (2) or (4) of Code Section 152(e) (entitling a noncustodial parent to a deduction under Code Section 151(c)) applies to any child of a Participant for any Plan Year, and if such child is under the age of 13 or is physically or mentally incapable of caring for himself/herself, then such child shall be treated as a dependent of the custodial parent (within the meaning of Code Section 152(e)(1)), and shall not be treated as a dependent of the noncustodial parent.

"Spouse" shall mean the person to whom a Participant is legally married; provided, that such term shall not include a person legally separated from the Participant under a decree of divorce or separate maintenance.

"Vision Plan" means the provisions of the Plan relating to the reimbursement of expenses for vision care, treatment, and materials as set forth in the applicable Supplement(s).

2.2     Controlling Authority.  This Plan document is the sole and controlling source of rights under the Plan.  To the extent that any Supplement or provision thereof is inconsistent herewith, such provision is hereby amended so that it is consistent herewith, unless expressly stated otherwise in the Supplement.  This Plan may only be amended in accordance with Article 8 herein and may not be amended by any oral statement or statement contained in any other writing.

2.3     Gender and Number.  Except as otherwise indicated by context, masculine terminology used herein also includes the feminine and neuter, and terms used in the singular also include the plural.

CHICAGO/#1050073.3

## ARTICLE 3

## PARTICIPATION AND ELIGIBILITY

3.1     Commencement of Participation. Every Eligible Employee on the Effective Date shall be eligible to become a Participant on that date. Every other individual who is an Eligible Employee shall be eligible to become a Participant on their first day of employment if such Eligible Employee's completed enrollment forms are received by the Benefits Committee within 31 calendar days of such date. If such completed forms are received more than 31 calendar days after such date of hire, coverage shall begin on the first day of the calendar month coinciding with or next succeeding the receipt of such completed forms.

3.2     Benefit Eligibility. Unless a specific eligibility requirement is set forth in a Supplement, an Eligible Employee shall become eligible for benefits under each component of this Plan on the date set forth in Section 3.1. Any employee or former employee of an Employer eligible for any benefit described in a Supplement shall be considered a Participant in the Plan; provided, however, any Participant or his/her Dependent or beneficiary shall only be eligible for benefits specifically made applicable by any such Supplement.

3.3     Participation Conditions. As a condition of participation and receipt of benefits under this Plan, each Participant must:

(a)     Agree to furnish to the Plan Administrator the application to participate provided for in Section 4.4;

(b)     Observe all Plan rules and regulations;

(c)     Consent to inquiries by the Plan Administrator with respect to any physician, hospital, or other provider of medical care or other services involved in a claim for benefits under the Medical Plan or for reimbursement of Medical Expenses or Dependent Care Expenses; and

(d)     Submit to the Plan Administrator all reports, bills, and other information that the Employer may reasonably require, including written substantiation by a third party of the amount of any Health Care Expense or Dependent Care Expense to be reimbursed, and a written statement by the Participant that such expense is not reimbursable through other sources.

3.4     Termination of Participation. Except as provided in the appropriate Supplement a Participant's participation in this Plan shall terminate when the first of the following events occurs:

(a)     the first day of the next Plan Year following the Participant's election not to participate in the Plan;

(b)     the date the Participant ceases to be an Eligible Employee;

(c)     the date the Participant's employment with all Employers terminates; provided, however, that if a Participant or a Dependent of a Participant elects continuation

7

coverage under Section 4980B(f) of the Code with regard to the Plan, his/her participation shall terminate at the end of such period of continuation coverage; or

> (d)    the date the Plan terminates.

3.5    <u>COBRA Continuation Coverage.</u>

(a)    A Participant, his/her Spouse and his/her Dependents may elect to continue participating in those portions of the Plan that constitute "group health plans" within the meaning of Code Section 5000(b) pursuant to the Participant's current election for the Plan Year, and thus continue participating in those portions of the Plan for up to 18 months (for the remainder of the Plan Year in the case of the Medical Expense Reimbursement Plan) after participation would otherwise end for one of the following reasons (called "qualifying events"): (1) voluntary termination of the Participant's employment; (2) involuntary termination of the Participant's employment for reasons other than gross misconduct; or (3) reduction in work hours to fewer than the number of hours required for participation in the Plan. Notwithstanding the foregoing for "group health plans" other than the Medical Expense Reimbursement Plan, a Participant, Spouse or Dependent may continue participating in the Plan for an additional 11 months (29 months total) if on the "qualifying event" or within the first 60 days immediately following the qualifying event, the Participant or any family member who was covered under the Plan immediately prior to the "qualifying event" is determined to be disabled under the Social Security Act, and the Committee is so informed of such determination before the end of the first 18 months of coverage and within 60 days of such determination.

(b)    A Participant's Spouse may elect to continue participating in those portions of the Plan that constitute "group health plans" within the meaning of Code Section 5000(b) (other than the Medical Expense Reimbursement Plan) pursuant to the Participant's current election for the Plan Year, and thus participate in those portions of the Plan for up to 36 months after any of the following "qualifying events" occurs: (1) the Participant's death; (2) divorce from the Participant; (3) legal separation from the Participant; or (4) the Participant's entitlement to Medicare benefits.

(c)    A Dependent of a Participant may elect to continue participating in those portions of the Plan that constitute "group health plans" within the meaning of Code Section 5000(b) (other than the Medical Expense Reimbursement Plan) pursuant to the Participant's current election for the Plan Year, and thus participate in those portions of the Plan for up to 36 months after the Dependent no longer qualifies as a covered Dependent under the Plan.

(d)    A Participant, Spouse, and each Dependent child may make separate elections regarding continuation of participation.

(e)    The Company will notify an individual who becomes entitled to elect to continue participation. However, employees and their families must notify the Committee within 60 days of a divorce or legal separation, or when a child no longer qualifies as a covered Dependent under the Plan. Failure to notify the Committee within 60 days will result in a loss of any continuation of participation.

8

(f)     An individual will have 60 or more days to decide whether or not to continue participating in the Plan, beginning no later than the date participation would otherwise terminate due to a qualifying event. The election period will end on the later of: (1) 60 days following the date participation would otherwise terminate due to a qualifying event; or (2) 60 days following the date the individual is notified of his/her right to continue participating because of a qualifying event.

(g)     An individual who elects COBRA continuation coverage must pay for such coverage with after-tax dollars. If he/she decides to continue coverage after the date coverage would otherwise terminate, he/she must, within 45 days from the date of his/her election, pay for his/her retroactive coverage. At that time, he/she may have to make up to four months of contributions, including (1) the contributions due during the 60-day election period; (2) the contribution due during the 45-day payment period; and (3) the contribution due for the current month. After that, regular monthly payments for coverage will be due on or before the first of each month (with a 30-day grace period).

(h)     Continued participation in the Plan for any covered person will cease and cannot be reinstated if: (1) the maximum time period (18, 29 or 36 months) is reached; (2) payment is not received on a timely basis; (3) the person becomes covered by another group health plan, unless that group health plan contains a limitation for a pre-existing condition of that person; (4) the person becomes entitled to Medicare; (5) the Company terminates the Plan; or (6) with regard to the additional 11 months of coverage, the family member who was disabled is determined to no longer be disabled under the Social Security Act.

CHICAGO/#1050073.3

# ARTICLE 4

## RETIREE MEDICAL PLAN AND
## POST-EMPLOYMENT SURVIVOR COVERAGE

4.1     Eligibility.     An Eligible Employee shall be eligible to participate in the Company's Retiree Medical Plan if he/she terminates employment with the Company and all Affiliates on or after May 1, 2003 and is at least age 50 and has at least 5 years of service with the Company and all Affiliates at the time of his termination ("Eligible Retiree").  An Eligible Employee who terminates employment with the Company and all Affiliates prior to May 1, 2003 must be at least age 55 and have 10 years of service at the time of termination in order to be an Eligible Retiree.

4.2     Medical Plan.  The retiree medical benefits provided to the Eligible Retiree shall be the benefits provided to active employees under the Medical Plan.

4.3     Cost Sharing for Grandfathered Eligible Retirees.  An Eligible Employee who as of May 1, 2003 is at least age 50 and has at least 5 years of service, and whose employment with the Company and all Affiliates ends after the Eligible Employee attains age 55 and has completed at least 10 years of service (a "Grandfathered Eligible Retiree"), shall be eligible to receive retiree medical benefits based on the following cost-sharing chart (with the percentages equal to the Company's portion of the full cost for such coverage as determined by the Company) determined when the Grandfathered Eligible Retiree elects to commence retiree medical coverage:

### AGE WHEN RETIREE MEDICAL BENEFITS BEGIN

| Service at Term | 55 | 56 | 57 | 58 | 59 | 60 | 61 | 62 | 63 | 64 | 65 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 10 | 50.0% | 52.0% | 54.0% | 56.0% | 58.0% | 60.0% | 62.0% | 64.0% | 66.0% | 68.0% | 70.0% |
| 11 | 52.0% | 54.0% | 56.0% | 58.0% | 60.0% | 62.0% | 64.0% | 66.0% | 68.0% | 70.0% | 72.0% |
| 12 | 54.0% | 56.0% | 58.0% | 60.0% | 62.0% | 64.0% | 66.0% | 68.0% | 70.0% | 72.0% | 74.0% |
| 13 | 56.0% | 58.0% | 60.0% | 62.0% | 64.0% | 66.0% | 68.0% | 70.0% | 72.0% | 74.0% | 76.0% |
| 14 | 58.0% | 60.0% | 62.0% | 64.0% | 66.0% | 68.0% | 70.0% | 72.0% | 74.0% | 76.0% | 78.0% |
| 15 | 60.0% | 62.0% | 64.0% | 66.0% | 68.0% | 70.0% | 72.0% | 74.0% | 76.0% | 78.0% | 80.0% |
| 16 | 62.0% | 64.0% | 66.0% | 68.0% | 70.0% | 72.0% | 74.0% | 76.0% | 78.0% | 80.0% | 82.0% |
| 17 | 64.0% | 66.0% | 68.0% | 70.0% | 72.0% | 74.0% | 76.0% | 78.0% | 80.0% | 82.0% | 84.0% |
| 18 | 66.0% | 68.0% | 70.0% | 72.0% | 74.0% | 76.0% | 78.0% | 80.0% | 82.0% | 84.0% | 86.0% |
| 19 | 68.0% | 70.0% | 72.0% | 74.0% | 76.0% | 78.0% | 80.0% | 82.0% | 84.0% | 86.0% | 88.0% |
| 20 | 70.0% | 72.0% | 74.0% | 76.0% | 78.0% | 80.0% | 82.0% | 84.0% | 86.0% | 88.0% | 90.0% |
| 21 | 72.0% | 74.0% | 76.0% | 78.0% | 80.0% | 82.0% | 84.0% | 86.0% | 88.0% | 90.0% | 90.0% |
| 22 | 74.0% | 76.0% | 78.0% | 80.0% | 82.0% | 84.0% | 86.0% | 88.0% | 90.0% | 90.0% | 90.0% |
| 23 | 76.0% | 78.0% | 80.0% | 82.0% | 84.0% | 86.0% | 88.0% | 90.0% | 90.0% | 90.0% | 90.0% |
| 24 | 78.0% | 80.0% | 82.0% | 84.0% | 86.0% | 88.0% | 90.0% | 90.0% | 90.0% | 90.0% | 90.0% |
| 25 | 80.0% | 82.0% | 84.0% | 86.0% | 88.0% | 90.0% | 90.0% | 90.0% | 90.0% | 90.0% | 90.0% |
| 26 | 82.0% | 84.0% | 86.0% | 88.0% | 90.0% | 90.0% | 90.0% | 90.0% | 90.0% | 90.0% | 90.0% |
| 27 | 84.0% | 86.0% | 88.0% | 90.0% | 90.0% | 90.0% | 90.0% | 90.0% | 90.0% | 90.0% | 90.0% |
| 28 | 86.0% | 88.0% | 90.0% | 90.0% | 90.0% | 90.0% | 90.0% | 90.0% | 90.0% | 90.0% | 90.0% |
| 29 | 88.0% | 90.0% | 90.0% | 90.0% | 90.0% | 90.0% | 90.0% | 90.0% | 90.0% | 90.0% | 90.0% |
| 30+ | 90.0% | 90.0% | 90.0% | 90.0% | 90.0% | 90.0% | 90.0% | 90.0% | 90.0% | 90.0% | 90.0% |

4.4     Cost-Sharing for Eligible Retirees who Terminate Prior to May 1, 2003.  An Eligible Retiree who terminates employment with the Company and all Affiliates prior to May 1, 2003 shall be eligible to receive retiree medical benefits based on the cost-sharing chart set forth in Section 4.3, but such benefits must commence immediately upon termination of employment.

10

CHICAGO/#1050073.3

An Eligible Retiree under this Section 4.4 who does not elect to commence benefits immediately upon termination of employment shall not be entitled to commence such benefits at a later time.

4.5    Cost Sharing for Eligible Retirees who are not Grandfathered Eligible Retirees. An Eligible Retiree who terminates employment with the Company and all Affiliates on or after May 1, 2003, and who is not a Grandfathered Eligible Retiree, shall be eligible for benefits in accordance with this Section 4.5:

(a)    An Eligible Retiree whose employment with the Company and all Affiliates terminates prior to age 55 will be eligible for benefits under this Article 4, but will be required to pay 100% of the full cost of his/her retiree medical coverage as determined by the Company.

(b)    An Eligible Retiree whose employment with the Company and all Affiliates terminates at or after age 55 shall be eligible for benefits under this Article 4, with cost-sharing based on the following:

(i)    the full cost of retiree medical coverage for a particular Plan Year (based on the medical option chosen by the Eligible Retiree), *minus*

(ii)    the Eligible Retiree's retiree medical credit for that Plan Year.

(c)    An Eligible Retiree's retiree medical credit shall equal:

(i)    the Eligible Retiree's years of service (after age 40) with the Company and all Affiliates when his/her employment terminates (maximum 20 years), *multiplied by*

(ii)    $250, if the Eligible Retiree is under age 65, or not otherwise eligible for Medicare, or

(iii)    $125, if the Eligible Retiree is age 65 or older, or is otherwise eligible for Medicare.

(d)    In addition, an Eligible Retiree's retiree medical credit is doubled if he/she covers one or more family members (i.e., Spouse/Domestic Partner or other Dependents). An Eligible Retiree's retiree medical credit shall be reduced from $250 to $125 when the Eligible Retiree attains age 65 (or earlier if the Eligible Retiree become eligible for Medicare). If the Eligible Retiree's Spouse is under age 65 (and not otherwise eligible for Medicare) and the Eligible Retiree is age 65 or older (or otherwise eligible for Medicare), the credit is not reduced.

(e)    In all events, an Eligible Retiree will be required to contribute at least 10% of the full cost of his/her retiree medical benefits as determined by the Company based on the medical option selected and the number of individuals covered.

(f)    An Eligible Retiree's retiree medical credit will be adjusted each calendar year by the lesser of:

11

        (i)     7%, or

        (ii)    the amount of medical inflation in the prior year, as determined by the Company.

4.6    <u>Retiree Medical Benefits for Individuals who Retired prior to January 1, 2000</u>. An individual who retired prior to January 1, 2000 under a heritage Sandoz Corporation or Ciba-Geigy Corporation retiree medical plan shall be eligible to continue receiving retiree medical benefits under such retiree medical plan, based on a cost-sharing percentage (from 0% to 100%) as determined from time-to-time by the Company.

4.7    <u>Post-Employment Survivor Coverage</u>.

    (a)    An Eligible Employee whose employment with the Company and all Affiliates ends after the Eligible Employee attains age 55 and has completed at least 10 years of service (a "Covered Retiree") will be covered by post-employment survivor coverage in the amount of $10,000.

    (b)    The beneficiary of a Covered Retiree will be paid a lump sum survivor benefit once the Plan Administrator is notified of the Covered Retiree's death.

    (c)    The Covered Retiree may name any person (including his/her estate) or more than one person as his/her primary beneficiary. The Covered Retiree also may name any person as a contingent beneficiary to receive benefit if his/her primary beneficiary is not living at the time of his/her death.

    (d)    If there is a named beneficiary surviving to receive benefits at the time of the Covered Retiree's death, and the primary beneficiary dies before benefits are paid, the survivor benefit will be paid to the Covered Retiree's contingent beneficiary; provided that if there is no surviving contingent beneficiaries, the survivor benefit will be paid to the primary beneficiary's estate.

    (e)    If there is no beneficiary (primary or contingent) surviving to receive benefits at the time of the Covered Retiree's death, payment will be paid to the first of these survivors:

        (i)    the Covered Retiree's spouse

        (ii)    the Covered Retiree's children (in equal shares)

        (iii)   the Covered Retiree's parents (in equal shares)

        (iv)   the Covered Retiree's brothers and sisters (in equal shares)

        (v)    the Covered Retiree's estate.

CHICAGO/#1050073.3

**ARTICLE 5**

**BENEFIT ELECTIONS AND PREMIUM CONTRIBUTIONS**

5.1     Flexible Contributions.

(a)     For each Period of Coverage, each Participant shall be entitled to elect, in accordance with Section 5.3, to reduce his/her Compensation by his/her Premium Contribution and his/her Flexible Contribution.

(b)     In no event shall a Participant's Contributions be refunded or otherwise paid to the Participant directly or indirectly, or carried over or applied to provide benefits in any subsequent Period of Coverage.

(c)     A Participant's Contributions shall reduce the Participant's Compensation ratably on each pay day during the Period of Coverage.

(d)     In administering the Plan, the Committee may adopt such election forms and procedures as the Committee deems to be desirable.

5.2     Benefit Selections.

(a)     Each Participant may elect the following benefits and agree to pay the applicable Premium Contributions:

        (i)     Medical Plan

        Medical Plan options include those options described in the enrollment materials and summary plan description(s) provided to Employees, as more fully set forth in the applicable Supplement. Coverage may be waived.

        (ii)     Dental Plan

        Dental Plan options include those options described in the enrollment materials and summary plan description(s) provided to Employees, as more fully set forth in the applicable Supplement. Coverage may be waived.

        (iii)     Vision Plan

        The terms of the Vision Plan are described in enrollment materials and summary plan description(s) provided to Employees, as more fully set forth in the applicable Supplement. Coverage may be waived.

CHICAGO/#1050073.3

(iv)    Life Insurance Plan

The terms of the Life Insurance Plan (including optional and dependent coverage) are described in enrollment materials and summary plan description(s) provided to Employees, as more fully set forth in the applicable Supplement.

(v)    Long-Term Disability ("LTD") Plan

The terms of the LTD Plan, to the extend applicable, are described in enrollment materials and summary plan description(s) provided to Employees, as more fully set forth in the applicable Supplement.

(vi)    Legal Assistance Plan

The terms of the Legal Assistance Plan are described in enrollment materials and summary plan description(s) provided to Employees, as more fully set forth in the applicable Supplement.

(vii)    Long Term Care Insurance Plan

The terms of the Long Term Care Insurance Plan are described in enrollment materials and summary plan description(s) provided to Employees, as more fully set forth in the applicable Supplement.

(b)    The Company may, from time to time, offer additional or different benefit options or may eliminate one or more such benefit options, in its sole discretion, as set forth in the applicable Supplements, as they may be amended from time to time.

5.3    Time of Election. A Participant's initial Flexible Contribution elections under Section 5.1, as well as his/her benefit selections under Section 5.2, shall be made as part of his/her application to participate. Thereafter, a Participant may change his/her elections and/or selections for a subsequent Period of Coverage in accordance with procedures established by the Committee; provided such change in election must be completed prior to the first day of the Period of Coverage for which such change is to be effective at such time and in such form as is acceptable to the Committee, consistent with Section 5.6.

5.4    Application to Participate. Each Eligible Employee shall submit an application on or after his/her first day of employment (with any such applications submitted prior to such first day of employment being deemed received on such first day of employment), or during an Open Enrollment Period, in writing or using such other means, including a telephone response system, as the Committee may determine, in which he/she makes a Flexible Contribution election with respect to his/her Compensation for the Plan Year in question and a Premium Contribution election with regard to the selection of benefits available hereunder. The application shall specify how his/her Flexible Contribution and Premium Contribution shall be applied, and in what amounts or proportions, and shall supply any other pertinent information that the Committee reasonably requires. The application shall be delivered to the Committee (or its authorized agents) in accordance with the procedures established by the Committee from time to

14

time. Each such election shall be effective during the Plan Year (or such remainder thereof) with respect to which it is made, and shall thereafter remain effective until changed by the Participant.

5.5    Default Elections. In the event a Participant fails upon his/her initial enrollment to make a valid selection among any of the options offered by the Plan, the Participant shall be deemed to have selected no coverage, except for such benefits that are provided by the Employer without the requirement of Participant Contributions. A Participant who, after his/her initial enrollment, fails to make a valid selection among any of the options offered by the Plan shall be deemed to have elected to continue the benefits previously validly elected.

5.6    Irrevocability of Election. A Participant's elections under Sections 5.1 and 5.2, or pursuant to 5.5, shall be irrevocable during the Period of Coverage, except that:

(a)    the Committee shall limit a Participant's Contributions and/or benefits in accordance with Sections 5.7, 6.5, 7.5 and 8.1(h); and

(b)    for any of the following changes in status, if such change in status satisfies the requirements of subsection (c) below, a Participant shall be entitled to change his/her benefit election for the remainder of the Period of Coverage in a manner that is consistent with such change in status, if such change is communicated to the Plan Administrator no later than 30 days after such change in status:

(i)    a change in a Participant's legal marital status, including the following: marriage, death of spouse, divorce, legal separation and annulment;

(ii)    a change in the Participant's number of dependents, including the following: birth, death, adoption and placement for adoption;

(iii)    a change in the employment status of the Participant, the Participant's Spouse or Dependent, including the following: a termination or commencement of employment, a strike or lockout, a commencement of or return from an unpaid leave of absence, a change in worksite; and a change in employment that causes the individual to become (or cease to be) eligible under a cafeteria or other employee benefit plan;

(iv)    a Dependent satisfies or ceases to satisfy the Plan's eligibility requirements; and

(v)    a change in the place of residence of the Participant, Spouse, Domestic Partner or Dependent.

(c)    A change in status shall satisfy the consistency requirement for the Medical, Dental, Vision or Health Care Reimbursement Plan if such election change is on account of and corresponds with a change in status that affects eligibility for coverage under an employer's plan. A change in status that affects eligibility under the Plan includes a change in status that results in an increase or decrease in the number of a Participant's Dependent who may benefit from coverage under the Plan.

15

(d)    Any such change shall be effective as of the later of (i) the first day of the first calendar month beginning not less than 30 days (or such shorter period as the Committee may permit) after the date such Participant's written notice is received by the Committee or (ii) the first day of the first calendar month in which such change occurs.

5.7    Limitations on Flexible Contributions.

(a)    In no event shall the amount of a Participant's Flexible Contribution allocated to his/her Dependent Care Spending Account exceed $5,000 (including the 25% Company match to the Dependent Care Account, if applicable) during a Period of Coverage, or $2,500 if the Participant is married and filing a separate federal income tax return. In addition, if both the Participant and his/her spouse are eligible to participate in Dependent Care or dependent care reimbursement accounts, the Participant's Contribution allocated to the Dependent Care Spending Account shall not exceed $5,000 when combined with the spouse's contribution to his/her plan.

(b)    In no event shall the amount of a Participant's Flexible Contribution allocated to his/her Health Care Spending Account exceed $4,000 during a Period of Coverage.

(c)    If more than 25% of the benefits paid under the Plan during any Plan Year are paid to Participants who are Key Employees, as defined in Code Section 416(i)(1), the benefits paid under the Plan to all Key Employees during that Plan Year shall be taxable income.

5.8    Accounts for Convenience of Employer.  Any account established hereunder shall be a bookkeeping device for the convenience of the Plan Administrator and Employers.  Nothing herein shall require an Employer to segregate or set aside any portion of its assets for such purposes.

5.9    Refund or Carry-Over.  In no event shall the amount of contribution allocated to a Participant be carried over or applied to provide benefits in any subsequent Plan Year or used to purchase or provide benefits to the Participant under any other Plan of the Corporation.  Any amounts remaining in a Participant's Account as of the last day of a Plan Year (taking into account any grace period set forth in Sections 6.4 and 7.4, or as therewise established by the Plan Administrator, for submitting receipts) shall be forfeited.

16

## ARTICLE 6

## HEALTH CARE REIMBURSEMENT PLAN

6.1     Health Care Spending Accounts. The Plan shall establish a Health Care Spending Account for each Participant who elects to make a Flexible Contribution to a Health Care Spending Account for each Plan Year by reducing his/her Compensation in accordance with Sections 5.1.

6.2     Increases in Health Care Spending Accounts. A Participant's Health Care Spending Account for a Plan Year shall be credited at the beginning of each Plan Year with the Anticipated Health Care Contribution for that Plan Year that he/she has elected to apply toward his/her Health Care Spending Account pursuant to Sections 5.1. The Anticipated Health Care Contribution shall thereafter be adjusted as necessary during the Period of Coverage to reflect any changes in the Participant's benefit election permitted pursuant to Section 5.6 or as required by Section 5.7, 6.5, or 8.1(h), or to adjust for mixed deductions.

6.3     Decreases in Health Care Spending Accounts. A Participant's Health Care Spending Account for a Plan Year shall be reduced by the amount of any benefits paid to or on behalf of a Participant pursuant to Section 6.4.

6.4     Health Care Benefits.

(a)     Subject to limitations contained in other provisions of this Plan, a Participant who incurs Health Care Expenses during his/her Period of Coverage with respect to a Plan Year shall be entitled to receive from the Plan reimbursement for the amount of such expenses to the extent of the Anticipated Health Care Contribution for such Plan Year. The Plan shall reimburse the Participant for Health Care incurred after the presentation to the Committee of a claim for reimbursement that shall include such form(s) and documentation of expenses as may be required by the Code and the regulations promulgated by the Internal Revenue Service thereunder, and as shall be satisfactory to the Committee, and upon the acceptance of such claim (or a portion thereof) by the Committee. During the Plan Year, Participants shall be reimbursed within a reasonable period of time not to exceed one month after an acceptable claim is filed with the Committee, or its authorized agent. Notwithstanding anything herein to the contrary, any claim with respect to a Plan Year must be filed before the March 31st of the following Plan Year to be eligible for reimbursement. For purposes of this paragraph, claims for expenses submitted for reimbursement under the Employer's insured group health plan but not reimbursed thereunder shall not be considered filed with the Committee prior to such time as a benefit determination has been made by said insurer; provided, however, that such claim shall be considered as filed for purposes of the March 31st deadline of the following year.

(b)     If a Participant ceases to be an Eligible Employee, such Participant shall be entitled to continue receiving benefits pursuant to this Article for Health Care Expenses to the extent of the amount remaining in the Participant's Health Care Spending Account for the Plan Year; provided, however, that if such Participant ceases to be an Employee and does not elect and maintain COBRA continuation coverage pursuant to Section 3.5, then such Participant shall

17

not be entitled to receive benefits pursuant to this Article for Health Care Expenses incurred after the Participant ceased to be an Employee.

(c)    Upon presentation of a claim, a Participant shall submit a written statement by a third party substantiating the amount of the Health Care Expense, and the Participant shall expressly represent in writing that the item for which a claim is made is not subject to reimbursement under any plan or policy described in Section 6.5, or from any other source.

6.5    Limitations on Health Care Reimbursement Benefits.  Notwithstanding anything herein to the contrary no benefits shall be paid under this Article 6:

(a)    In the event and to the extent that such reimbursement or payment is covered under any insurance policy or policies, whether paid for by the Employer or the Participant, or under any other health and accident plan by whomever maintained.  In the event that there is such a policy or plan in effect providing for such reimbursement or payment, in whole or in part, then to the extent of the coverage under such policy or plan, the Plan shall be relieved of any liability hereunder; and

(b)    To the extent that an expense has been submitted for reimbursement from a Participant's Dependent Care Spending Account.

6.6    Forfeiture of Unused Benefits.  If, following the final payment of reimbursement benefits for Health Care Expenses incurred during the Period of Coverage for any Plan Year, any amount remains in a Participant's Health Care Spending Account for that Plan Year, the Participant shall forfeit such amount and have no further claim thereto.

6.7    Separate Written Plan.  To the extent required under the Code, this Article 6 shall constitute a separate written plan providing for the reimbursement of Health Care Expenses.  To the extent necessary, other provisions of the Plan are incorporated by reference herein.

18

## ARTICLE 7

## DEPENDENT CARE REIMBURSEMENT PLAN

7.1    Dependent Care Spending Accounts.  The Plan shall establish for each Participant a Dependent Care Spending Account for each Plan Year.

7.2    Increases in Dependent Care Accounts.  A Participant's Dependent Care Account for a Plan Year shall be credited at such time as provided in Article 5 with the portion of the Participant's Flexible Contributions for that Plan Year that he/she has elected to apply toward his/her Dependent Care Account pursuant to Section 5.1.

7.3    Decreases in Dependent Care Spending Accounts.  A Participant's Dependent Care Account for a Plan Year shall be reduced by the amount of any benefits paid to or on behalf of a Participant pursuant to Section 7.4.

7.4    Dependent Care Benefits.

(a)    Subject to limitations contained in other provisions of this Plan, a Participant who incurs Dependent Care Expenses during his/her Period of Coverage with respect to a Plan Year shall be entitled to receive during the Plan Year from the Plan reimbursement for the amount of such expenses to the extent of the amount then credited to the Participant's Dependent Care Account for that Plan Year; provided, however, that a Participant is not entitled to receive total reimbursements during a Plan Year in excess of the lesser of the Earned Income of either the Participant or the Participant's Spouse, and further, that no reimbursement shall be paid pursuant to this Article 7 to the extent an expense has been submitted for reimbursement from a Participant's Health Care Spending Account.  The Employer shall reimburse the Participant for Dependent Care Expenses incurred upon the presentation to the Claims Administrator of a claim for reimbursement that shall include such form(s) and documentation of expenses in a form satisfactory to the Claims Administrator, and the acceptance of such claim (or a portion thereof) by the Claims Administrator.  Participants shall be reimbursed for such expenses within a reasonable period of time after an acceptable claim is filed with the Claims Administrator.  Notwithstanding anything herein to the contrary, a claim with respect to a Plan Year must be filed before the March 31st of the following Plan Year to be eligible for reimbursement.

(b)    If a Participant submits an acceptable claim that exceeds the amount credited to his/her Dependent Care Account, such claim shall be treated as accepted to the extent of the balance of his/her Account and the remainder shall be treated as an accepted claim in subsequent months until fully paid or the Participant's Account for the Plan Year has been fully exhausted.

(c)    If a Participant ceases to be an Eligible Employee or terminate employment with the Company and all Affiliates, such Participant shall be entitled to continue receiving benefits pursuant to this Article 7 to the extent of the amount remaining in the Participant's Dependent Care Account for the Plan Year of the termination of his/her employment.

19

7.5     Limitation on Contributions and Benefits.

(a)     No more than 25% of the total benefits paid from Dependent Care Accounts pursuant to Section 7.4 during any Plan Year may be paid to Participants who own, directly or indirectly, more than 5% of the profits or income interest, or stock of the Employer, as the case may be, on any day during the Plan Year, or to Participants who are spouses or Dependents of any individual with such stock ownership (the "Prohibited Group").  If the Committee believes that this 25% limit may be exceeded, it shall limit (a) the amount of a Participant's Contributions that may be used to increase his/her Dependent Care Account pursuant to Section 7.2 and/or (b) the amount of benefits that may be paid to such Participants, so that the limit will not be exceeded; provided that any such limitation imposed by the Committee shall apply on a uniform basis pursuant to rules applicable equally to all Participants who are members of the Prohibited Group.

(b)     In no event shall the total benefits paid to a Participant in any Plan Year under this Article 7 exceed the amount excludable from income under Section 129 of the Code.

7.6     Forfeiture of Unused Benefits.  If, following the final payment of reimbursement benefits for eligible expenses incurred during the Period of Coverage for any Plan Year, any amount remains in a Participant's Dependent Care Account for that Plan Year, the Participant shall forfeit such amount and have no further claim thereto.

7.7     Annual Statement of Benefits.  The Employer shall furnish to each individual who was a Participant and who received benefits under Section 7.4 during the prior plan calendar year a statement of all such benefits paid to or on behalf of such Participant during the prior plan year.

7.8     Separate Written Plan.  For purposes of the Code, this Article 7 shall constitute a separate written plan providing a program of dependent care assistance.  To the extent necessary, other provisions of the Plan are deemed incorporated by reference herein.

20

## ARTICLE 8

## PLAN ADMINISTRATION

8.1     <u>Administration of Plan</u>.     The Plan shall be administered by the Plan Administrator.  The Committee shall be the Plan Administrator unless the Board of Directors of the Company or the Committee designates another party to act as Plan Administrator with respect to any Supplement.  If another party is so designated, it shall acknowledge in writing that it is a fiduciary with respect to the Plan.  The Plan Administrator shall have authority to control and manage the operation and administration of the Plan or applicable Supplement including all rights and powers necessary or convenient to the carrying out of its functions hereunder, whether or not such rights and powers are specifically enumerated herein.  Benefits under this Plan shall be paid only if the Plan Administrator determines in its discretion that the applicant is entitled to them.  Without limiting the generality of the foregoing, and in addition to the other powers set forth in the Plan, the Plan Administrator shall have the following express discretionary authorities:

(a)     to construe and interpret the terms of the Plan, and to resolve all ambiguities, inconsistencies or omissions therein;

(b)     to decide all questions of eligibility and determine the amount, manner and time of payment of any benefits hereunder;

(c)     to prescribe procedures to be followed by Participants with respect to benefit requests, elections, or benefit claims under the Plan;

(d)     to prepare and distribute, in such manner as determined to be appropriate, information explaining the Plan;

(e)     to designate Eligible Employees under a portion or all of the Plan;

(f)     to receive or request from the Employers, Participants, Dependents and beneficiaries such information as shall be necessary for the proper administration of the Plan;

(g)     to furnish the Employers upon request such annual and other reports with respect to the administration of the Plan as are reasonable and appropriate;

(h)     to reduce the amount of Participants' Contributions and/or benefits in order to satisfy any non-discrimination tests imposed by the Code;

(i)     to determine the amounts available to provide a benefit and to administer the claims procedure;

(j)     to delegate authority with regard to its responsibilities hereunder to any individual, officer, insurance carrier or committee, including authority to subdelegate;

21

(k)    to appoint or employ an administrator for the Plan and any other agents it deems advisable, including accountants, investment advisors and legal counsel who may or may not also be employed by the Company or an Employer; and

(l)    to appoint or name a Claims Administrator to handle the administration of claims.

8.2    <u>Rules and Procedures</u>.  The Plan Administrator may adopt such rules, regulations and bylaws as it deems necessary or desirable.

8.3    <u>Claims Procedure</u>.    Once a Participant's or Dependent's (collectively the "Claimant's") claim has been documented and the Claimant has completed all necessary forms, the Plan Administrator shall notify the Claimant as follows –

(a)    <u>Medical, Dental, Vision and Health Care Account Spending Claims</u>.

(i)    <u>Urgent Care Claims</u>. If the claim is determined to require Urgent Care, the Plan Administrator shall notify the Claimant of the Plan's benefit determination (whether adverse or not) no later than 72 hours after receipt of the claim by the Plan, unless the Claimant fails to provide sufficient information to determine whether, or to what extent, benefits are covered or payable under the Plan. In the case of such a failure, the Plan Administrator shall notify the Claimant no later than 24 hours after receipt of the claim by the Plan, of the specific information necessary to complete the claim. The Claimant shall have 48 hours to provide the specified information. The Plan Administrator shall notify the Claimant of the Plan's benefit determination 48 hours after the earlier of –

(A)    The Plan's receipt of the specified information, or

(B)    The end of the period afforded the Claimant to provide the specified additional information.

(ii)    <u>Concurrent care decisions</u>. If the Plan has approved an ongoing course of treatment to be provided over a period of time or number of treatments –

(A)    Any reduction or termination by the Plan of such course of treatment (other than by plan amendment or termination) before the end of such period of time or number of treatments shall constitute an Adverse Benefit Determination. The Plan Administrator shall notify the Claimant of the Adverse Benefit Determination at a time sufficiently in advance of the reduction or termination to allow the Claimant to appeal and obtain a determination on review of that Adverse Benefit Determination before the benefit is reduced or terminated.

(B)    Any request by a Claimant to extend the course of treatment beyond the period of time or number of treatments that is a claim involving Urgent Care shall be decided as soon as possible and the Plan Administrator shall notify the Claimant of the benefit determination, whether adverse or not, within 24 hours after receipt of the claim by the Plan, provided

22

that any such claim is made to the plan at least 24 hours prior to the expiration of the prescribed period of time or number of treatments. For purposes of this Plan, all claims submitted for reimbursement under the Health Care Spending Account are Post-Service Claims.

        (iii)    <u>Other claims</u>. In the case of a claim not described above, the Plan Administrator shall notify the Claimant of the Plan's benefit determination in accordance with the following –

        (A)    <u>Pre-Service Claims</u>. In the case of a Pre-Service Claim, the Plan Administrator shall notify the Claimant of the Plan's benefit determination (whether adverse or not) no later than 15 days after receipt of the claim by the Plan. This period may be extended one time by the Plan for up to 15 days, provided that the Plan Administrator both determines that such an extension is necessary due to matters beyond the control of the Plan and notifies the Participant or Dependent, prior to the expiration of the initial 15-day period, of the circumstances requiring the extension of time and the date by which the Plan expects to render a decision. If such an extension is necessary due to a failure by the Claimant to submit the information necessary to decide the claim, the notice of extension shall specifically describe the required information, and the Claimant shall be afforded at least 45 days from receipt of the notice within which to provide the specified information.

        In the case of a failure by the Claimant to follow the Plan's procedures for filing a Pre-Service Claim, the Claimant shall be notified of the failure and the proper procedures to be followed in filing a claim for benefits. This notification shall be provided to you not later than 5 days (24 hours in the case of a failure to file a claim involving Urgent Care) following the failure. Notification may be oral, unless written notification is requested by the Claimant.

        (B)    <u>Post-Service Claims</u>. In the case of a Post-Service Claim, the Plan Administrator shall notify the Claimant of the Plan's Adverse Benefit Determination no later than 30 days after receipt of the claim. This period may be extended one time by the Plan for up to 15 days, provided that the Plan Administrator both determines that such an extension is necessary due to matters beyond the control of the Plan and notifies the Claimant, prior to the expiration of the initial 30-day period, of the circumstances requiring the extension of time and the date by which the Plan expects to render a decision. If such an extension is necessary due to a failure of the Claimant to submit the information necessary to decide the claim, the notice of extension shall specifically describe the required information, and the Claimant shall be afforded at least 45 days from receipt of the notice within which to provide the specified information.

        (iv)    <u>Manner and content of notification of benefit determination</u> –

        (A)    Except as provided in paragraph (2) of this section, the Plan Administrator shall provide the Claimant with written or electronic notification of

any Adverse Benefit Determination. Any electronic notification shall comply with the standards imposed by the Department of Labor. The notification shall set forth, in a manner calculated to be understood by the Claimant –

      (1)    The specific reason or reasons for the adverse determination;

      (2)    Reference to the specific Plan provisions on which the determination is based;

      (3)    A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary;

      (4)    A description of the Plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under Section 502(a) of ERISA following an Adverse Benefit Determination on review;

      (5)    If an internal rule, guideline, protocol, or other similar criterion was relied upon in making the adverse determination, either the specific rule, guideline, protocol, or other similar criterion; or a statement that such a rule, guideline, protocol, or other similar criterion was relied upon in making the adverse determination and that a copy of such rule, guideline, protocol, or other criterion will be provided free of charge to the claimant upon request;

      (6)    If the Adverse Benefit Determination is based on a medical necessity or experimental treatment or similar exclusion or limit, either an explanation of the scientific or clinical judgment for the determination, applying the terms of the Plan to your medical circumstances, or a statement that such explanation will be provided free of charge upon request.

      (7)    In the case of an Adverse Benefit Determination concerning a claim involving Urgent Care, a description of the expedited review process applicable to such claims.

    (B)    In the case of an Adverse Benefit Determination concerning a claim involving Urgent Care, the information described in paragraph (1) of this section may be provided to the Claimant orally within the time frame prescribed above, provided that a written or electronic notification in accordance with paragraph (1) of this section is furnished to the Claimant not later than 3 days after the oral notification.

If a Claimant's claim has been denied, or if the Claimant has not heard anything within the time period specified above after the Claimant has sent it in, the Claimant can appeal the denial and have his/her claim reviewed. The Claimant has 180 days to appeal from the time the Claimant is

24

notified of the denial, or 180 days from the end of the processing period, if the Claimant has heard nothing by that time.

Those reviewing a Claimant's claim must:-

(I)     Provide for a review that does not afford deference to the initial Adverse Benefit Determination and that is conducted by an appropriate named fiduciary of the Plan who is neither the individual who made the Adverse Benefit Determination that is the subject of the appeal, nor the subordinate of such individual;

(II)     Provide that, in deciding an appeal of any Adverse Benefit Determination that is based in whole or in part on a medical judgment, including determinations with regard to whether a particular treatment, drug, or other item is experimental, investigational, or not medically necessary or appropriate, the appropriate named fiduciary shall consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment;

(III)     Provide for the identification of medical or vocational experts whose advice was obtained on behalf of the Plan in connection with your Adverse Benefit Determination, without regard to whether the advice was relied upon in making the benefit determination;

(IV)     Provide that the health care professional engaged for purposes of a consultation be an individual who is neither an individual who was consulted in connection with the Adverse Benefit Determination that is the subject of the appeal, nor the subordinate of any such individual; and

(V)     Provide, in the case of a claim involving Urgent Care, for an expedited review process pursuant to which--(A) A request for an expedited appeal of an Adverse Benefit Determination may be submitted orally or in writing by the claimant; and (B) All necessary information, including the plan's benefit determination on review, shall be transmitted between the plan and the claimant by telephone, facsimile, or other available similarly expeditious method.

Further, the Plan Administrator shall notify the Claimant of the Plan's benefit determination on review in accordance with the following -

(VI)     <u>Urgent Care Claims</u>. If the Claimant's treating physician determines that the claim requires Urgent Care, the Plan Administrator shall notify the Claimant of the Plan's benefit determination on review not later than 72 hours after receipt of the Claimant's request for review of an adverse benefit determination by the Plan.

(VII)     <u>Pre-Service Claims</u>. In the case of a Pre-Service Claim, the Plan Administrator shall notify the Claimant of the Plan's benefit determination

on review not later than 30 days after receipt by the Plan of the Claimant's request for review of an Adverse Benefit Determination.

(VIII) <u>Post-Service Claims</u>. In the case of a Post-Service Claim the Plan Administrator shall notify the Claimant of the Plan's benefit determination on review not later than 60 days after receipt by the Plan of your request for review of an Adverse Benefit Determination.

Manner and content of notification of benefit determination on review - The Plan Administrator shall provide the Claimant with written or electronic notification of the Plan's benefit determination on review. Any electronic notification shall comply with the standards imposed by the Department of Labor. In the case of an Adverse Benefit Determination, the notification shall set forth, in a manner calculated to be understood by the claimant –

(I)     The specific reason or reasons for the adverse determination;

(II)    Reference to the specific Plan provisions on which the benefit determination is based;

(III)   A statement that the Claimant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to your claim for benefits. Whether a document, record, or other information is relevant to a claim for benefits shall be determined by reference to 29 C.F.R. Section 2560.503-1(m)(8);

(IV)    A statement describing any voluntary appeal procedures offered by the Plan and the Claimant's right to obtain the information about such procedures, and a statement of the Claimant's right to bring an action under Section 502(a) of ERISA;

(V)     If an internal rule, guideline, protocol, or other similar criterion was relied upon in making the adverse determination, either the specific rule, guideline, protocol, or other similar criterion; or a statement that such rule, guideline, protocol, or other similar criterion was relied upon in making the adverse determination and that a copy of the rule, guideline, protocol, or other similar criterion will be provided free of charge to the claimant upon request;

(VI)    If the Adverse Benefit Determination is based on a medical necessity or experimental treatment or similar exclusion or limit, either an explanation of the scientific or clinical judgment for the determination, applying the terms of the Plan to your medical circumstances, or a statement that such explanation will be provided free of charge upon request; and

(VII)   The following statement: "You and your plan may have other voluntary alternative dispute resolution options, such as mediation. One way to find out what may be available is to contact your local U.S. Department of Labor Office and your State insurance regulatory agency."

26

(v)     Definitions.

(A)     Urgent Care - means any claim for medical care or treatment where denial of such care –

(1)     Could seriously jeopardize the Claimant's life or health or the Claimant's ability to regain maximum function, or,

(2)     In the opinion of a physician with knowledge of your medical condition, would subject you to severe pain that cannot be adequately managed without the care or treatment that is the subject of the claim.

Whether a claim is a claim involving Urgent Care within the meaning of this section is to be determined by an individual acting on behalf of the Plan applying the judgment of a prudent layperson who possesses an average knowledge of health and medicine. However, any claim that a physician with knowledge of the claimant's medical condition determines is a claim involving Urgent Care within the meaning of this section shall be treated as a claim involving Urgent Care for purposes of this section.

(B)     Pre-Service Claim - means any claim for a benefit under a group health plan with respect to which the terms of the Plan condition receipt of the benefit, in whole or in part, on approval of the benefit in advance of obtaining medical care.

(C)     Post-Service Claim - means any claim for a benefit under a group health plan that is not a Pre-Service Claim within the meaning of paragraph (2) of this section.

(D)     Adverse Benefit Determination - means any of the following: a denial, reduction, or termination of, or a failure to provide or make payment (in whole or in part) for, a benefit, including any such denial, reduction, termination, or failure to provide or make payment that is based on a determination of a participant's or beneficiary's eligibility to participate in a plan, and including, with respect to group health plans, a denial, reduction, or termination of, or a failure to provide or make payment (in whole or in part) for, a benefit resulting from the application of any utilization review, as well as a failure to cover an item or service for which benefits are otherwise provided because it is determined to be experimental or investigational or not medically necessary or appropriate.

(b)     Other Claims.

(i)     Any Claimant who believes that he/she is entitled to a benefit under the Plan in an amount greater than he/she has received may file a claim for such

27

benefit by writing to the Claims Administrator or Plan Administrator designated to process claims under the Plan or in the applicable Supplement.

(ii)    Every claim that is properly filed shall be answered in writing within ninety (90) days (or one hundred eighty (180) days if special circumstances require an extension of time for processing the claim) of receipt stating whether the claim is granted or denied. If special circumstances require an extension of time for processing the claim, then the claimant shall be so notified within ninety (90) days. If the claim is denied, the claimant shall be provided specific reasons for denial; specific reference to the pertinent Plan provisions on which the denial is based; a description of any information necessary for the claimant to perfect a claim including an explanation of why such information is necessary; and an explanation of the Plan's claim appeal procedure including steps to be taken to submit the claim for review. Notwithstanding anything in the foregoing to the contrary, a claim for short-term or long-term disability benefits shall be answered in writing within forty-five (45) days (with two thirty (30) day extensions available) if special circumstances require an extension of time for processing the claim).

(iii)    Within sixty (60) days after notice that a claim is denied, the claimant may file a written appeal to the Plan Administrator that shall include any comments, statements or documents the claimant may wish to provide. Notice of the decision on appeal shall be sent to the claimant within sixty (60) days of its receipt (or one hundred twenty (120) days if special circumstances require an extension of time for processing the appeal). In the event the claim is denied upon appeal, the Notice shall set forth the reasons for denial written in a manner calculated to be understood by the claimant and specific reference to the pertinent provisions of the Plan on which the denial is based. Any reasonable request from a claimant for documents or information relevant to his/her claim prior to his/her filing an appeal shall also be allowed. Notwithstanding anything in the foregoing to the contrary, if a claim for short-term or long-term disability benefits made on or after the Effective Date is denied, the claimant may file the written appeal to the Plan Administrator within one hundred and eighty (180) days after notice that a claim is denied. Notice of the decision on appeal shall be sent within forty-five (45) days of its receipt (or ninety (90) days is special circumstances require an extension of time for processing the appeal).

(iv)    If notice of the denial of the claim or appeal is not furnished in the time limits set forth above, the claim or appeal shall be deemed denied.

(c)    Notwithstanding anything in the foregoing to the contrary, the claims procedure set forth in any Supplement shall control for the benefits under that Supplement to the extent that such claims procedure is consistent with the applicable U.S. Department of Labor regulations.

CHICAGO/#1050073.3

8.4    Actions of the Plan Administrator.  All determinations, interpretations, rules, and decisions of the Plan Administrator or its delegate shall be conclusive and binding upon all persons having or claiming to have any interest or right under the Plan.

8.5    Delegation.  The Plan Administrator shall have the power to delegate specific duties, discretionary and other authorities and responsibilities to officers or employees of the Company or other individuals or entities.  Any delegation by the Plan Administrator may allow further delegations by the individual or entity to whom the delegation is made.  Any delegation may be rescinded by the Plan Administrator at any time.  Each person or entity to whom a duty or responsibility has been delegated shall be responsible for the exercise of such duty or responsibility and shall not be responsible for any act or failure to act of any other person or entity.

8.6    Reliance on Experts.  The Plan Administrator and its delegates shall be entitled to rely on any and all schedules, valuations, certificates, reports, opinions or advice furnished by any duly appointed actuary, accountant, legal counsel, physician or other medical expert and any other duly appointed advisor.  Any such advisor may be a person, firm or other organization acting or employed in like capacity for the Company or an Employer.

8.7    Reports and Records.  The Plan Administrator and those to whom the Plan Administrator has delegated duties under the Plan shall keep records of all their proceedings and actions and shall maintain books of account, records, and other data as shall be necessary for the proper administration of the Plan in compliance with applicable law.

8.8    Finances.  The costs of the Plan shall be borne as provided herein or in any applicable Supplement.

8.9    HIPAA Compliance.

(a)    Effective April 14, 2003, notwithstanding any other provision in the Plan to the contrary, this Section 8.9 shall control with respect to the use and/or disclosure under the Plan of individually identifiable health information which is determined to be protected health information pursuant to 45 C.F.R. § 164.501 ("Protected Health Information").

(b)    The Committee, the Company and/or an appropriate Affiliate may use and/or disclose Protected Health Information received from the Plan, without first obtaining a written authorization from the Participant or Dependent or otherwise providing an opportunity for the Participant or Dependent to agree or object in the situations described in 45 C.F.R. § 164.512, and as necessary, for the following purposes related to the administration of the Plan:

(i)    Payment, health care operations or other general administrative matters;

(ii)    Provision of Medical (including prescription drug), Dental, and Health Care Spending Account Benefits under the Plan; and

(iii)    To carry out the Plan administration duties granted to the Company and the Committee pursuant to the terms of the Plan documents.

29

(c)     As a condition of receiving Protected Health Information from the Plan for the purposes identified in Section 8.9(b) of the Plan, the Committee, the Company and each appropriate Affiliate agree to:

(i)     Not use or further disclose Protected Health Information other than as permitted or required by the Plan or as required by law;

(ii)     Ensure that any agents, including any subcontractors, to whom Protected Health Information received from the Plan is provided agree to the same restrictions and conditions that apply to the Committee, Company or Affiliate with respect to such Protected Health Information;

(iii)     Not use or disclose the Protected Health Information for employment-related actions and decisions or in connection with any other employee benefit plan sponsored by the Company or in connection with benefits under the Plan which are not Medical (including prescription drug), Dental, or Health Care Spending Account Benefits;

(iv)     Report to the Plan any use or disclosure of the Protected Health Information that is inconsistent with the uses or disclosures provided for herein of which it becomes aware;

(v)     Make available Protected Health Information to the Participant or Dependent for inspection and review in accordance with 45 C.F.R. § 164.524;

(vi)     Make available Protected Health Information to the Participant or Dependent for amendment and incorporate any appropriate amendments to Protected Health Information in accordance with 45 C.F.R. § 164.526;

(vii)     Make available the information required to provide to the Participant or Dependent an accounting of disclosures of Protected Health Information in accordance with 45 C.F.R. § 164.528;

(viii)     Make its internal practices, books, and records relating to the use and disclosure of Protected Health Information received from the Plan available to the United States Secretary of Health and Human Services for purposes of determining compliance by the Plan with 45 C.F.R. Part 164, Subpart E;

(ix)     If feasible, return or destroy all Protected Health Information received from the Plan that the Committee, Company or Affiliate still maintains in any form and retain no copies of such information when no longer needed for the purpose for which a disclosure was made, except that, if such return or destruction is not feasible, limit further uses and disclosures to those purposes that make the return or destruction of the information infeasible; and

(x)     Ensure that there is in place adequate separation between the Plan and the Committee, Company or Affiliate to restrict the access to and use of Protected Health Information by certain Company or Affiliate employees, designated persons and

30

contractors to only that which is necessary for the Committee, Company or Affiliate to perform a plan administration function on behalf of the Plan.

(d)     The Plan will disclose Protected Health Information to the Committee, Company or Affiliate only upon receipt of a certification by the Company that the Plan has been amended to incorporate the provisions set forth in Section 8.9(c) above.

(e)     A benefits employee of the Company or an Affiliate (including, but not limited to, a benefits manager, benefits specialist, human resources assistant, payroll manager, senior payroll assistant and shared services manager), the Committee and any individual designated by them may have access to and use Protected Health Information as necessary to carry out the purposes related to the administration of the Plan as set forth in Section 8.9(b) above.

(f)     To the extent the Committee, Company or Affiliate becomes aware of an inappropriate use or disclosure of Protected Health Information by an individual identified in Section 8.9(e) above, the Committee, Company or Affiliate shall immediately notify the Plan. The Company shall cooperate with the Plan in mitigating any harmful effects resulting from such inappropriate use or disclosure of Protected Health Information.

31

# ARTICLE 9

## AMENDMENTS AND TERMINATION

9.1    <u>Amendments</u>.  The Company may amend the Plan, in full or in part, at any time and from time to time, including but not limited to changing or eliminating one or more benefits provided hereunder and changing or eliminating any cost-sharing provisions hereunder or under any Supplement.

9.2    <u>Benefits Provided Through Third Parties</u>.  In the case of any benefit provided pursuant to an insurance policy or other contract with a third party, the Company may amend the Plan by changing insurers, policies, or contracts without changing the language of this Plan document, provided that copies of the contracts or policies are filed with the Plan documents and the Participants are informed as to the effects of any such changes.

9.3    <u>Termination</u>.  The Company may terminate the Plan at any time for any reason. Thereafter, neither any Employer nor any of its Employees shall have any further financial obligations hereunder except such that have accrued up to the date of termination and have not been satisfied.

CHICAGO/#1050073.3

## ARTICLE 10

## LIMITATIONS AND LIABILITIES

10.1    <u>Non-guarantee of Employment</u>.  Nothing contained in the Plan shall be construed as an agreement of employment, or as giving or conferring on any Employee the right to continued employment, or as a limitation on the right of an Employer to terminate the employment of an Employee, with or without cause.  Nor shall anything contained in the Plan affect the eligibility requirements under any other plans maintained by an Employer, nor give any Employee a right to coverage under any other plan.

10.2    <u>Non-alienation of Assets and Benefits</u>.  Except as may be required by applicable law or the terms of a Qualified Medical Child Support Orders under Section 10.3, neither the assets of, nor the benefits payable under the Plan, shall be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, charge, garnishment, execution, or levy of any kind, either voluntary or involuntary, including any such liability that is for alimony or other payments for the support of a spouse or former spouse, or for any other relative of the Employee, prior to actually being received by the person entitled to the benefit under the terms of the Plan; and any attempt to anticipate, alienate, sell, transfer, assign, pledge, encumber, charge or otherwise dispose of any right to benefits payable hereunder shall be void. Notwithstanding this paragraph 10.2, the Plan Administrator may, in its discretion, permit the assignment of benefits to medical providers under any Supplement providing health or accident benefits.

10.3    <u>Qualified Medical Child Support Orders</u>.  The Plan shall adopt, and may amend from time to time, such written procedures as are reasonable and necessary to determine the qualified status of, and if qualified, to comply with medical child support orders, as provided for in ERISA Section 609.

10.4    <u>Limitation of Liability</u>.  Neither an Employer nor the Plan Administrator shall be liable for any act or failure to act that is made in good faith pursuant to the provisions of the Plan or records of the Plan, Company, Employer, or any employee benefit plans thereof, except to the extent required by applicable law.  It is expressly understood and agreed that, except for its or their willful misconduct or gross neglect, neither the Company nor any other Employer, nor the Plan Administrator shall be subject to any legal liability to any Participant or beneficiary, for any cause or reason or thing whatsoever, in connection with this Plan.

10.5    <u>Indemnification</u>.  The Company may, to the extent permitted by its Certificate of Incorporation and Bylaws, and by the laws of the State in which it is incorporated, indemnify the Plan Administrator, Committee members, and any employee or director of an Employer, against any and all liabilities arising by reason of any act or omission made in good faith pursuant to the provisions of the Plan, including expenses reasonably incurred in the defense of any claim relating thereto.

CHICAGO/#1050073.3

10.6     Subrogation, Reimbursement, and Recovery for Third Party Liability Expenses.

As a condition for receiving benefits under the Plan, each Covered Individual agrees to and grants the Plan the right of subrogation, the right of reimbursement, and the right of recovery, as set forth herein.   To the extent that any Supplement also contains provisions regarding subrogation, reimbursement, or right of recovery of expenses, this Plan and the applicable Supplement shall both apply so as to grant the Plan the greatest possible rights with respect to subrogation, reimbursement, and recovery of such expenses or benefits.

(a)     Exclusion of Coverage for Expenses Caused by a Third Party.   Unless otherwise expressly stated in an applicable Supplement, the Medical, Dental and Vision Plans do not cover expenses for services and supplies relating to an illness, injury, disability or death incurred as a result of the actions of a Third Party who is or may be liable for all or part of such expenses. This exclusion from coverage also extends to claims due to injury, sickness, disability or death to the extent that payment is or may be made under the terms of any "no-fault" type of automobile policy, an uninsured or underinsured motorist coverage under an automobile policy, any homeowner's policy, workers compensation, or other similar insurance coverage.

(b)     Right of Subrogation.   Whether or not a Covered Individual executes a reimbursement agreement, the Covered Individual agrees as a condition to participation in or the receipt of benefits under the Plan that the Plan shall have the right of subrogation with respect to the full amount of benefits paid to or on behalf of a Covered Individual as the result of an injury, illness, disability or death that is or may be the responsibility of any Third Party.  The Plan shall also have a lien upon any recovery from such Third Party to the full amount of benefits paid and may, at its option, file suit or intervene in any pending lawsuit to secure and protect its rights. The Plan's right of subrogation shall apply to the first dollar of any recovery obtained from the Third Party, even if the recovery obtained is less than the amount needed to make whole the Covered Individual.

(c)     Reimbursement Agreement.   If a Covered Individual incurs expenses that are excluded in accordance with this provision of the Plan because they are or may be the responsibility of a Third Party, the Covered Individual will be required, as a prerequisite to receiving Plan benefits, to sign a reimbursement agreement in a form acceptable to the Plan Administrator acknowledging the Covered Individual's obligation to reimburse the Plan for any benefits or expense paid by the Plan from the first dollars recovered from any source.   If expenses are incurred by a minor, the Plan Administrator may require that the minor's parent or legal guardian execute the reimbursement agreement and agree to be bound by it.   The Plan Administrator may, in its discretion, withhold benefit payments that might otherwise be advanced, and/or prosecute an action at law or in equity in its own name or in the name of the Covered Individual, in order to enforce, secure, or protect the Plan's rights under this provision. If the Covered Person elects not to execute such an agreement, the Plan is not obligated to provide any benefit payments.

(d)     Right of Reimbursement.   Whether or not a Covered Individual executes a reimbursement agreement, in the event that the Plan provides benefits to a Covered Individual and the Covered Individual recovers a payment, either by settlement, judgment, no-fault automobile insurance statute, or otherwise, from any Third Party or other source, then the

34

Covered Individual shall immediately reimburse the Plan for the full amount of any and all benefits paid in connection with such injury, illness, disability or death, up to the amount of the recovery. This right of reimbursement applies regardless of the label assigned to the recovery, and regardless of any purported allocation or itemization of such recovery to specific types of injuries. If the recovery is for damages other than for medical or dental care expenses, such as pain and suffering, the Covered Person will still be required to reimburse the Plan first. The Plan shall have a lien upon any such recovery in the amount of benefits or expenses paid by the Plan. The Plan's right of reimbursement shall apply to the first dollar of any recovery obtained from the Third Party, even if the recovery obtained is less than the amount needed to make whole the Covered Individual.

(e)    Duty to Cooperate. The Covered Individual is required to cooperate fully with the Plan in connection with the exercise of its rights under this provision, to provide information, assistance and documents or other instruments as the Plan may require to facilitate the Plan's rights hereunder, and shall do nothing to prejudice such rights. The Covered Individual shall notify the Plan before filing any suit and shall not settle any claim against a Third Party without giving notice to and obtaining the consent of the Plan Administrator. If the Covered Individual notifies the Plan before suit or settlement, the Plan may retain the Covered Individual's attorney to represent the Plan. If the Plan hires the Covered Individual's attorney, the Plan will agree with the attorney on the amount of attorneys' fees and expenses that the Plan will pay. The Plan is not bound by the amount or percent of the Covered Individual's attorneys' fees, nor may the Covered Individual subtract them from what is repaid to the Plan without the Plan's consent. If the Covered Individual does not timely notify the Plan of suit or settlement, or does not cooperate with the Plan, or opposes the Plan in enforcing the Plan's subrogation or reimbursement rights, the Covered Individual shall pay the Plan's attorneys' fees and costs incurred because of the Covered Individual's actions or failure to act, in addition to any other rights or remedies that the Plan may have.

(f)    Right of Recovery or Offset. The Plan shall have the right to withhold the payment of benefits under this Plan if a Covered Individual has breached his/her obligations under this provision, and shall have the right to recover any benefits erroneously paid to a Covered Individual or his/her health care provider. The Plan may cease to advance payment of benefits under a reimbursement agreement if, in the discretion of the Plan Administrator, the Covered Individual has failed or is failing to fulfill his/her duty to cooperate. These rights are in addition to any other rights and remedies that the Plan may have.

(g)    Definitions. As used herein, the following terms are defined as follows:

Third Party - any person or entity who is or may be liable for an injury, illness, disability, or death of a Covered Individual, including without limitation: any insurance company for a Third Party or potentially-liable person or entity; workers' compensation; homeowners insurance; and all coverages under an automobile policy of the Covered Individual or a member of the Covered Individual's family, including "no-fault" coverage, medical coverage, and uninsured or underinsured motorist coverage. If appropriate under the circumstances, the Covered Individual may be considered a Third Party under this Section 10.6 if the Covered Individual is or may be responsible for the injury, illness, disability or death of a Covered

35

Individual and the Covered Individual has insurance coverage for such injury, illness, disability or death.

Covered Individual - any Employee or former Employee who is covered under any Supplement, and such individual's Dependents or beneficiaries, or the estate of any such person, as defined in the applicable Supplement.

10.7    <u>Applicable Law</u>.   The Plan and all rights hereunder shall be governed by and construed according to the laws of the State of New Jersey, except to the extent such laws are preempted by the laws of the United States of America.

CHICAGO/#1050073.3

**ARTICLE 11**

**FUNDING**

11.1    <u>Funding</u>.

(a)    Benefits under the Medical and Dental Plans shall, to the extent self-funded, be provided from a welfare benefits trust (if any), a contract of insurance, or the general assets of the Employers.

(b)    Benefits under the Vision, Life Insurance, Legal Services and Long Term Care Plans, together with any other Supplement that is provided through a contract of insurance, shall be provided through such contracts of insurance as are identified in each applicable Supplement.

(c)    Benefits under the Health Care Reimbursement Plan and Dependent Care Reimbursement Plan shall be provided through the Health Care Spending Accounts and Dependent Care Spending Accounts established under this Plan; provided, however, nothing in this Plan shall require that such accounts be held in trust or otherwise segregated from the general assets of the Company or any Employer.

37

# ARTICLE 12

## AFFILIATES

12.1    <u>Adoption of the Plan</u>.  Any Affiliate that is not an Employer may, with the Company's approval, adopt the Plan in accordance with any procedures adopted by the Company.  From and after the date on which an Affiliate adopts the Plan, it shall be included within the meaning of the word "Employer" for all purposes hereunder.

12.2    <u>Withdrawal of an Employer</u>.  An Employer may withdraw from the Plan as of any date in accordance with any procedures adopted by the Company.  If an Employer ceases to exist, it shall automatically be withdrawn from participation in the Plan unless a successor organization adopts the Plan.

12.3    <u>Obligation of Employers</u>.  Each Employer, by adopting the Plan, agrees to make all payments required hereunder to be made or provided to on behalf of Participants of such Employer, and agrees that the liability for making such payments and providing such benefits shall be the sole and exclusive obligation of such Employer.

12.4    <u>Cooperation by Each Employer</u>.  To enable the Plan Administrator to perform its functions, an Employer shall supply full and timely information to the Plan Administrator on all matters relating to the pay of all Participants, their retirement, death or other cause for termination of employment, and any other pertinent facts or information as a Plan Administrator, in its sole discretion, may require.

CHICAGO/#1050073.3

## SUPPLEMENT A

## NOVARTIS PHARMACEUTICALS CORPORATION
## MEDICAL PLAN

The eligibility for and terms of the Medical Plan are set forth in the Administrative Services Only Agreements ("ASO") between Novartis Pharmaceuticals Corporation and CIGNA and United Healthcare and Lumenos, which are hereby incorporated into the Plan as if fully set forth herein, to the extent not inconsistent with the terms hereof. The eligibility and terms are also set forth in contracts with various Health Maintenance Organizations ("HMOs"). The Claims Administrator and the Plan Administrators with respect to the Medical Plan are CIGNA, and United Healthcare, respectively or the applicable HMO provider. Lumenos is the Claims Administrator with respect to its portion of the Medical Plan and the Committee is the Plan Administrator with respect to the Lumenos portion of the Medical Plan.

A-1

**SUPPLEMENT B**

**NOVARTIS PHARMACEUTICALS CORPORATION**
**<u>DENTAL PLAN</u>**

The eligibility for and terms of the Dental Plan are set forth in an ASO agreement between Novartis Pharmaceuticals Corporation and Aetna, which is hereby incorporated into the Plan as if fully set forth herein, to the extent not inconsistent with the terms hereof. The Claims Administrator and Plan Administrator for the Dental Plan is Aetna.

CHICAGO/#1050073.3

**SUPPLEMENT C**

**NOVARTIS PHARMACEUTICALS CORPORATION**
**VISION PLAN**

The eligibility for and terms of the Vision Plan are set forth in an insurance contract between Novartis Pharmaceuticals Corporation and Vision Service Plan, which is hereby incorporated into the Plan as if fully set forth herein, to the extent not inconsistent with the terms hereof. The Claims Administrator and the Plan Administrator for the Vision Plan is Vision Service Plan.

CHICAGO/#1050073.3

**SUPPLEMENT D**

**NOVARTIS PHARMACEUTICALS CORPORATION**
**LONG-TERM DISABILITY PLAN**

The eligibility for and terms of the LTD Plan are set forth in the Novartis Pharmaceuticals Disability Plan which is hereby incorporated into the Plan as if fully set forth herein, to the extent not inconsistent with the terms hereof. The Claims Administrator and the Plan Administrator for the LTD Plan is Metropolitan Life Insurance Company.

CHICAGO/#1050073.3

**SUPPLEMENT E**

**NOVARTIS PHARMACEUTICALS CORPORATION**
**LEGAL ASSISTANCE PLAN**

The eligibility for and terms of the Legal Assistance Plan are set forth in an insurance contract between Novartis Pharmaceuticals Corporation and ARAG Group, which is hereby incorporated into the Plan as if fully set forth herein, to the extent not inconsistent with the terms hereof.  The Claims Administrator and the Plan Administrator of the Legal Assistance Plan is ARAG Group.

E-1

**SUPPLEMENT F**

**NOVARTIS PHARMACEUTICALS CORPORATION**
**HEALTH CARE REIMBURSEMENT PLAN**

     The Novartis Pharmaceuticals Corporation Health Care Reimbursement Plan provides medical expense reimbursement benefits to eligible employees of the Company. The Claims Administrator for the Health Care Reimbursement Plan is Hewitt Associates. The Plan Administrator for the Health Care Reimbursement Plan is the Committee.

F-1

## SUPPLEMENT G

## NOVARTIS PHARMACEUTICALS CORPORATION
## DEPENDENT CARE REIMBURSEMENT PLAN

     The Novartis Pharmaceuticals Corporation Dependent Care Reimbursement Plan offers Dependent Care reimbursement benefits to eligible employees of the Company. The Claims Administrator for the Dependent Care Reimbursement Plan is Hewitt Associates. The Plan Administrator for the Dependent Care Reimbursement Plan is the Committee.

G-1

**SUPPLEMENT H**

**NOVARTIS PHARMACEUTICALS CORPORATION**
**GROUP LONG TERM CARE INSURANCE PLAN**

The eligibility for and terms of the Group Long Term Care Insurance Plan are set forth in an insurance contract between Novartis Pharmaceuticals Corporation and John Hancock Insurance Company, which is hereby incorporated into the Plan as if fully set forth herein, to the extent not inconsistent with the terms hereof.   The Claims Administrator and the Plan Administrator of the Group Long Term Care Insurance Plan is John Hancock Insurance Company.

CHICAGO/#1050073.3

Exhibit 1

# AMENDMENT
## TO THE
## NOVARTIS PHARMACEUTICALS CORPORATION
## WELFARE BENEFITS PLAN
### (Amended and Restated Effective January 1, 2005)

The Novartis Pharmaceuticals Corporation Welfare Benefits Plan, as amended and restated effective January 1, 2005, is hereby amended, effective January 1, 2008, as follows:

1.    Section 3.5 shall read as follows:

3.5    COBRA Continuation Coverage.

(a)    A Participant, his/her Spouse, his/her Domestic Partner, his/her Dependents and children of the Participant's Domestic Partner who live with the Participant and his/her Domestic Partner (provided such individuals are dependents of the Domestic Partner under Code Section 152 ("Domestic Partner Child(ren)")) may elect to continue participating in those portions of the Plan that constitute "group health plans" within the meaning of Code Section 5000(b) pursuant to the Participant's current election for the Plan Year, and thus continue participating in those portions of the Plan for up to 18 months (for the remainder of the Plan Year in the case of the Medical Expense Reimbursement Plan) after participation would otherwise end for one of the following reasons (called "qualifying events"): (1) voluntary termination of the Participant's employment; (2) involuntary termination of the Participant's employment for reasons other than gross misconduct; or (3) reduction in work hours to fewer than the number of hours required for participation in the Plan. Notwithstanding the foregoing for "group health plans" other than the Medical Expense Reimbursement Plan, a Participant, Spouse, Domestic Partner, Dependent or Domestic Partner Child may continue participating in the Plan for an additional 11 months (29 months total) if on the "qualifying event" or within the first 60 days immediately following the qualifying event, the Participant, Domestic Partner or any family member thereof who was covered under the Plan immediately prior to the "qualifying event" is determined to be disabled under the Social Security Act, and the Committee is so informed of such determination before the end of the first 18 months of coverage and within 60 days of such determination.

(b)    A Participant's Spouse or Domestic Partner may elect to continue participating in those portions of the Plan that constitute "group health plans" within the meaning of Code Section 5000(b) (other than the Medical Expense Reimbursement Plan) pursuant to the Participant's current election for the Plan Year, and thus participate in those portions of the Plan for up to 36 months after any of the following "qualifying events" occurs: (1) the Participant's death; (2) divorce from the Participant; (3) legal separation from the Participant; (4) cessation of the Domestic Partner relationship; or (5) the Participant's entitlement to Medicare benefits.

     (c)    A Dependent of a Participant or a Domestic Partner Child may elect to continue participating in those portions of the Plan that constitute "group health plans" within the meaning of Code Section 5000(b) (other than the Medical Expense Reimbursement Plan) pursuant to the Participant's current election for the Plan Year, and thus participate in those portions of the Plan for up to 36 months after the Dependent no longer qualifies as a covered Dependent or covered Domestic Partner Child under the Plan.

     (d)    A Participant, Spouse, Domestic Partner, each Dependent child and each Domestic Partner Child may make separate elections regarding continuation of participation.

     (e)    The Company will notify an individual who becomes entitled to elect to continue participation. However, employees and their families must notify the Committee within 60 days of a divorce or legal separation, or when a child no longer qualifies as a covered Dependent or Domestic Partner Child under the Plan. Failure to notify the Committee within 60 days will result in a loss of any continuation of participation.

     (f)    An individual will have 60 or more days to decide whether or not to continue participating in the Plan, beginning no later than the date participation would otherwise terminate due to a qualifying event. The election period will end on the later of: (1) 60 days following the date participation would otherwise terminate due to a qualifying event; or (2) 60 days following the date the individual is notified of his/her right to continue participating because of a qualifying event.

     (g)    An individual who elects COBRA continuation coverage must pay for such coverage with after-tax dollars. If he/she decides to continue coverage after the date coverage would otherwise terminate, he/she must, within 45 days from the date of his/her election, pay for his/her retroactive coverage. At that time, he/she may have to make up to four months of contributions, including (1) the contributions due during the 60-day election period; (2) the contribution due during the 45-day payment period; and (3) the contribution due for the current month. After that, regular monthly payments for coverage will be due on or before the first of each month (with a 30-day grace period).

     (h)    Continued participation in the Plan for any covered person will cease and cannot be reinstated if: (1) the maximum time period (18, 29 or 36 months) is reached; (2) payment is not received on a timely basis; (3) the person becomes covered by another group health plan, unless that group health plan contains a limitation for a pre-existing condition of that person; (4) the person becomes entitled to Medicare; (5) the Company terminates the Plan; or (6) with regard to the additional 11 months of coverage, the family member who was disabled is determined to no longer be disabled under the Social Security Act.

CHICAGO/#1703585.1

2.    Supplement A (Medical Plan) shall read as follows:

## SUPPLEMENT A

## NOVARTIS PHARMACEUTICALS CORPORATION
## MEDICAL PLAN

The eligibility for and terms of the Medical Plan are set forth in the Administrative Services Only Agreements ("ASO") between Novartis Pharmaceuticals Corporation and United Healthcare and Horizon Blue Cross and Blue Shield, which are hereby incorporated into the Plan as if fully set forth herein, to the extent not inconsistent with the terms hereof. The eligibility and terms are also set forth in contracts with various Health Maintenance Organizations ("HMOs"), provided that the Aetna HMO shall not be available in Massachusetts. The Claims Administrator and the Plan Administrators with respect to the Medical Plan are United Healthcare and Horizon Blue Cross and Blue Shield, respectively, or the applicable HMO provider.

3.    Supplement I (Life Insurance Plan) shall read as follows:

## SUPPLEMENT I

## NOVARTIS PHARMACEUTICALS CORPORATION
## LIFE INSURANCE PLAN

The eligibility for and terms of the Life Insurance Plan are set forth in an insurance contract between Novartis Pharmaceuticals Corporation and Metropolitan Life Insurance Company, which is hereby incorporated into the Plan as if fully set forth herein, to the extent not inconsistent with the terms hereof. The Claims Administrator and the Plan Administrator for the Life Insurance Plan is Metropolitan Life Insurance Company.

CHICAGO/#1703585.1

ATTACHMENT 2

DRAFT
10/13/06

**SUPPLEMENT D**

**NOVARTIS PHARMACEUTICALS CORPORATION
WELFARE BENEFITS PLAN**

NOVARTIS PHARMACEUTICALS CORPORATION
DISABILITY PLAN

(Amended and Restated Effective January 1, 2007)

# TABLE OF CONTENTS

**Page**

Article 1     Establishment of Plan ................................................................. 1
   1.1     Purpose........................................................................................ 1
   1.2     Definitions.................................................................................... 1

Article 2     Eligibility and Participation ......................................................... 4
   2.1     Employee Eligibility ................................................................... 4
   2.2     Termination of Participation ....................................................... 4

Article 3     Short-Term Disability Benefits.................................................... 5
   3.1     General......................................................................................... 5
   3.2     Description of Benefits ................................................................ 5
   3.3     Disability Period .......................................................................... 5
   3.4     Physician's Supervision............................................................... 5
   3.5     Medical Examination ................................................................... 6
   3.6     Payment of Benefits..................................................................... 6
   3.7     Non-duplication of Benefits......................................................... 6
   3.8     Subsequent Disability After Returning to Work........................... 7
   3.9     Subsequent Disability While Receiving Benefits.......................... 7
   3.10    Part Time Employment................................................................. 7
   3.11    Cessation of Benefits ................................................................... 7
   3.12    Unpaid Leave While Appealing Claim ......................................... 8

Article 4     Long Term Disability Benefits .................................................... 9
   4.1     General......................................................................................... 9
   4.2     Eligibility .................................................................................... 9
   4.3     Levels of Disability Benefits ....................................................... 9
   4.4     Benefit Limitation for Substance Abuse ...................................... 9
   4.5     Survivor Benefits ...................................................................... 10
   4.6     Medical Examination ................................................................. 10
   4.7     Payment of Benefits................................................................... 11
   4.8     Non-duplication of Benefits....................................................... 11
   4.9     Reemployment ........................................................................... 11
   4.10    Rehabilitation Program .............................................................. 11
   4.11    Cessation of Benefits ................................................................. 12

Article 5     Plan Administration ................................................................... 13
   5.1     Administration of Plan............................................................... 13
   5.2     Rules and Procedures................................................................. 14
   5.3     Claims Procedure....................................................................... 14
   5.4     Actions of the Plan Administrator ............................................. 14
   5.5     Delegation ................................................................................. 14

CHICAGO/#564019.3

**TABLE OF CONTENTS**
(continued)

Page

| | | |
|---|---|---|
| 5.6 | Reliance on Experts | 15 |
| 5.7 | Reports and Records | 15 |
| 5.8 | Finances | 15 |
| Article 6 | Funding and Contributions | 16 |
| 6.1 | Funding | 16 |
| 6.2 | Participant Contributions | 16 |
| Article 7 | Amendment and Termination of the Plan | 17 |
| 7.1 | Amendment and Termination | 17 |
| Article 8 | Miscellaneous | 18 |
| 8.1 | Applicable Law | 18 |
| 8.2 | Status of Employment Relations | 18 |
| 8.3 | Number and Gender | 18 |
| 8.4 | Captions | 18 |
| 8.5 | Facility of Payments | 18 |
| 8.6 | Severability of Provisions | 18 |
| 8.7 | No Assignment of Benefits | 18 |
| 8.8 | Subrogation, Reimbursement, and Recovery for Third Party Liability Expenses | 19 |

CHICAGO/#564019.3

## ARTICLE 1

### Establishment of Plan

1.1    Purpose.    It is the intention of the Company to continue to provide for the administration of the Novartis Pharmaceuticals Corporation Disability Plan for the benefit of Eligible Employees of the Employers.  This Plan is intended to provide short-term and long-term disability benefits to Eligible Employees during a period of Disability.

1.2    Definitions.  Where the following underlined terms appear capitalized in this Plan document, they shall have the meanings set forth in this Section unless the context clearly indicates to the contrary.

"Base Salary" means the Participant's base salary, before reduction to reflect any tax-deferred or tax-exempt contributions, at the commencement of his/her Disability.  Base Salary excludes bonus, commissions, over time pay and shift differential.

"Benefit" means the amount payable under the Plan to a Disabled Participant, as provided in Articles 3 or 4.

"Claims Administrator" means the person or entity appointed as Claims Administrator pursuant Article 5.

"Code" means the Internal Revenue Code of 1986, as amended.

"Committee" means the Novartis Pharmaceuticals Corporation Benefits Committee.

"Company" means Novartis Pharmaceuticals Corporation.

"Disability or Disabled" means the Participant's inability to perform the duties of his/her occupation as a result of a bona fide Injury or Illness and the Participant is under the regular care of a Physician and complying with such Physician's treatment plan that the Claims Administrator has determined is reasonable and appropriate, and, effective on and after January 1, 2006, (1) for short-term disability purposes under Article 3 and for the first 24 months of long-term disability benefits under Article 4, the Participant is unable to earn at least 80% of his/her Total Pay, and (2) for purposes of long-term disability benefits after 24 months under Article 4, the Participant is unable to earn at least 60% of the Participant's Total Pay.  Notwithstanding anything in the Plan to the contrary, a Participant who incurs an Injury or Illness shall not be deemed to be Disabled or have a Disability if such Injury or Illness was caused by (a) a self-inflicted injury, whether intentional or due to insanity, (b) an act of war, whether declared or undeclared, (c) active duty in the armed forces of any country, (d) imprisonment as a result of being convicted of a crime or other public offense, (e) any Injury or Illness due to a cosmetic procedure or a procedures that is determined under the Company's Point of Service ("POS") option under the Novartis Pharmaceuticals Corporation Welfare Benefits Plan not to be medically necessary (regardless of whether such POS option covers such Participant) but will include procedures covered under the POS option, (f) active participation in a riot, or (g) an attempt to commit a felony.

1

"Eligible Employee" means an employee who is (i) on the payroll of an Employer; (ii) scheduled to work at least 20 hours per week; and (iii) is not a Member of a Collective Bargaining Agreement.  An individual shall not be an Eligible Employee during such times as he/she is designated by the Employer, in its discretion, as an independent contractor.

"Employer" means Novartis Pharmaceuticals Corporation and any affiliate that has adopted the Plan.

"Illness" means physical sickness, substance abuse, mental illness or functional nervous disorder.  The term Illness shall include pregnancy.

"Injury" means bodily strain or trauma.

"Member of a Collective Bargaining Unit" means any employee who is included in a collective bargaining unit and whose terms and conditions of employment are or were covered by a collective bargaining agreement if there is evidence that disability benefits were the subject of good-faith bargaining between representatives of such employee and the Employer, unless such collective bargaining agreement makes this Plan applicable to such employee.

"Mental or Nervous Disorder or Disease" means a medical condition of sufficient severity to meet the diagnostic criteria established in the current Diagnostic and Statistical Manual of Mental Disorders.

"Participant" means an Eligible Employee who satisfies the participation requirements of Article 3.

"Physician" means a person duly licensed to practice medicine, to prescribe and administer drugs, and to perform surgery.

"Plan" means the Novartis Pharmaceuticals Corporation Disability Plan.  This Plan is a component of the Novartis Pharmaceuticals Corporation Welfare Benefits Plan.

"Plan Year" shall mean the Plan's fiscal year of January 1 to the following December 31.

"Third Party" means any person or entity who is or may be liable for a Disability of a Participant, including without limitation: any insurance company for a Third Party or potentially-liable person or entity; workers' compensation; homeowners insurance; and all coverages under an automobile policy of the Participant or a member of the Participant's family, including "no-fault" coverage, medical coverage, and uninsured or underinsured motorist coverage.  If appropriate under the circumstances, the Participant may be considered a Third Party if the Participant is or may be responsible for the Disability of the Participant and the Participant has insurance coverage for such Disability.

"Total Pay" shall mean the Participant's base salary plus most recent bonus and the prior year's commissions, overtime pay and shift differential, before reduction to reflect any tax-deferred or tax-exempt contributions, at the commencement of his/her Disability.

2

"Year of Service" means the period of time that an employee has been employed by the Employer, which shall be determined in the same manner as it is determined under the Novartis Pharmaceuticals Corporation Investment Savings Plan.

CHICAGO/#564019.3

## ARTICLE 2

### Eligibility and Participation

2.1    <u>Employee Eligibility</u>.  An Eligible Employee shall become a Participant in this Plan on the first day of employment if he/she is then actively at work.

2.2    <u>Termination of Participation</u>.  Plan participation will terminate for a Participant upon the first to occur of the following:

    (a)    the date the Participant ceases to be an employee;

    (b)    the failure to pay any required Participant contributions; or

    (c)    the date the Plan terminates.

4

ARTICLE 3

Short-Term Disability Benefits

3.1     <u>General</u>. The obligations of the Plan and the Employer to pay short-term disability benefits shall be fully satisfied by the payment of Benefits in accordance with this Article.

3.2     <u>Description of Benefits</u>.

     (a)     A Participant who has incurred a Disability shall be eligible to receive the following short-term disability Benefits:

| Years of Service | Short-Term Disability Benefits |
|---|---|
| Less than Five | • 100% of Base Salary for the first 13 weeks of Disability<br>• 70% of Base Salary for the next 13 weeks of Disability |
| Five or More | • 100% of Base Salary for the first 26 weeks of Disability |

Notwithstanding anything in the foregoing to the contrary, a Participant who was an employee of Ciba-Geigy Corporation with fewer than five Years of Service as of December 31, 1997 shall be entitled to receive 100% of Base Salary for the first 26 weeks of Disability regardless of his/her actual Years of Service.

     (b)     A Participant who is a resident of the State of California whose short-term disability Benefits continue for more than 26 weeks shall receive the following short-term disability Benefit for the 27th through 52nd week of Disability as follows:

         (i)     50% of Base Salary if supplemental long-term disability coverage under Section 4.3(b) is not in effect at the time the Disability commenced.

         (ii)     67% of Base Salary if supplemental long-term disability coverage under Section 4.3(b) is in effect at the time the Disability commenced.

     (c)     For purposes of this Article 3, for Participants who are residents of the State of California, "52 weeks" shall be substituted for "26 weeks" wherever used herein.

3.3     <u>Disability Period</u>. In order to be eligible to receive Benefits under this Article 3, a Participant must be Disabled for more than 7 consecutive calendar days for an Injury or Illness.

3.4     <u>Physician's Supervision</u>. A Participant shall not be eligible to receive Benefits under this Article 3 unless the Participant's Physician completes a "Physician's Disability Certification" form in a manner acceptable to the Plan Administrator verifying:

     (a)     the nature of the Illness or Injury;

     (b)     the anticipated period of Disability;

5

(c)    the anticipated date on which the Participant may return to work; and

(d)    any physical restrictions upon the Participant's resuming work.

3.5    Medical Examination.

(a)    A Physician appointed by the Employer or by the Claims Administrator may require that a Participant have a medical examination before receiving or continuing to receive short-term disability Benefits under this Article 3. If such Physician disagrees with the Participant's Physician regarding whether the Participant is Disabled, the Employer or Claims Administrator shall appoint a third Physician to render an objective final decision relating to such examination.

(b)    An Employer or the Claims Administrator may at intervals of 8 weeks after a determination that the Participant is Disabled (or more frequently if the Employer or Claims Administrator has reason to believe that the Participant is no longer Disabled) request as a condition for receiving additional Benefits that the Participant have another medical examination. If the Physician appointed by the Employer or by the Claims Administrator disagrees with the Participant's Physician regarding whether the Participant is Disabled, the Employer or Claims Administrator shall appoint a third Physician to render an objective final decision relating to such examination.

3.6    Payment of Benefits.

(a)    A Participant shall not become eligible for short-term disability Benefits until the Claims Administrator determines that the Participant is Disabled. While a claim for short-term disability Benefits is pending, an Employer may elect in its sole discretion to advance the Participant's Base Salary for up to fifteen (15) business days (or longer if the Employer determined in its sole discretion that any delay in processing the claim is outside of the Participant's or Participant's Physician's control), subject to the Employer's ability to recoup such advances if the Participant is determined by the Claims Administrator not to be Disabled (or if the period of Disability is determined to be less than the period over which such advances are made).

(b)    Short-term disability Benefits shall be paid through the Employer's regular payroll system from the general assets of the Employer at the same time as regular payrolls are paid. Short-term disability Benefits shall be subject to the same deductions as are regular wages.

3.7    Non-duplication of Benefits. If a Participant becomes eligible for or begins receiving disability benefits in addition to the benefits under the Plan, benefits under this Article 3 shall be reduced, but not below zero, by the benefit the Participant receives, or becomes eligible to receive, from another source. Other sources of disability benefits include workers' compensation, Social Security, federal or state disability benefits, defined benefit pension benefits (even if paid as a lump sum), no fault automobile laws or insurance policies, and payment for lost wages from a Third Party (including but not limited to any related payments from any federal or state government or agency).

6

3.8     Subsequent Disability After Returning to Work. If a Participant returns to work for an Employer after his/her Disability and is subsequently Disabled, the Participant's benefits will be determined as follows:

(a)     If the Participant returns to work for less than 26 weeks, and the Participant's subsequent Disability is the same as his/her prior Disability, the Participant will be eligible to receive Benefits under this Article 3 for a total of 26 weeks, taking into account Benefits for the current Disability and such prior Disability.

(b)     If the Participant returns to work for less than 26 weeks and received a total of 26 weeks of Benefits under this Article 3 with respect to such prior Disability, the Participant shall not be eligible to receive benefits under this Article 3, but may be entitled to long-term disability Benefits under Article 4.

(c)     If the Participant returns to work for 26 weeks or more, and the Participant's subsequent Disability is the same as his/her prior Disability, the Participant's Disability shall be treated as a new Disability for purposes of this Article 3.

(d)     If the Participant returns to work for any period of time and the subsequent Disability is a different Disability, the Participant's Disability shall be treated as a new Disability for purposes of this Article 3.

3.9     Subsequent Disability While Receiving Benefits. If a Participant is receiving Benefits under this Article 3 for one Disability, and experiences a second Disability while receiving such Benefits, the Participant will receive short-term disability Benefits for a maximum of 26 weeks to cover both Disabilities.

3.10     Part Time Employment.

(a)     With proper documentation, a Participant may work for an Employer part-time while receiving short-term disability Benefits under this Article 3. If the Participant returns to work with restrictions, the Participant will be eligible to work part-time for the remainder of the 26 weeks. Any full or partial day worked will be counted as part of the 26 week disability period. The Participant will receive his/her rate of pay in effect at the time the Disability began for any time worked during his/her Disability. Any time for which the Participant is not working will be paid in accordance with this Article 3.

(b)     If a Participant works part-time beyond 26 weeks and long-term disability Benefits begin under Article 4, the Participant's short-term disability Benefits will end — even if he/she continues to work part-time. The Participant's part-time work may be considered part of his/her long-term disability rehabilitation program under Section 4.8.

3.11     Cessation of Benefits. A Participant's short-term disability Benefits under this Article 3 shall cease on the first to occur of:

(a)     the Participant ceases to be Disabled;

(b)     the Participant or his/her Physician fails to provide medical documentation acceptable to the Plan Administrator that the Participant is Disabled;

7

(c)    the day before the Participant returns to work for the Employer or another employer;

(d)    the Participant's employment ends on a termination date that is established and communicated to the Participant prior to the Participant becoming Disabled, or which would have been communicated to the Participant but for the Participant's absence from work;

(e)    the date the Claims Administrator determines that the Participant has stopped receiving reasonable and appropriate medical treatment for his/her Disability;

(f)    the date the Claims Administrator determines that the Participant has stopped cooperating with the rehabilitation program;

(g)    the date the Claims Administrator determines the Participant refused to cooperate when referred for an independent medical examination

(h)    the date the Participant (or his/her Physician) refuses to supply information requested by the Claims Administrator;

(i)    the day before the Participant retires or voluntarily resigns from the Employer;

(j)    the date the Participant refuses to repay amounts advanced to him/her by the Plan or paid to the Participant in error;

(k)    the Participant receives 26 weeks of Benefits under this Article 3; or

(l)    the Participant dies.

3.12    Unpaid Leave While Appealing Claim.   In the event that a Participant's claim for Benefits under this Article 3 is denied in whole or in part (including, but not limited to, a determination by the Claims Administrator that the Participant's benefits shall cease under Section 3.11(a) or (b) above), and if such Participant timely appeals such denial prior to the date that his/her employment terminates, the Participant will, if he/she is not otherwise performing part-time or full-time services for the Company, be placed on an unpaid leave by the Company pursuant to the Company's Unpaid Medical Leave Policy during the pendency of such appeal. Such unpaid leave will run concurrently with any leave available under the Company's Family Care Leave Policy and applicable state and Federal law, including the Family and Medical Leave Act, and will not extend the amount of leave to which the Participant may otherwise be entitled.

8

ARTICLE 4

Long Term Disability Benefits

4.1     General.  The obligations of the Plan and the Employer to pay long-term disability Benefits shall be fully satisfied by the payment of Benefits in accordance with this Article.

4.2     Eligibility.  A Participant shall only be entitled to receive long-term disability Benefits if he/she has received 26 weeks of short-term disability Benefits (52 weeks if a resident of the State of California) under Article 3 of this Plan.

4.3     Levels of Disability Benefits.

(a)     The basic long-term disability Benefit under this Article 4 is 50% of a Participant's Total Pay, with a minimum monthly benefit of $100.

(b)     A Participant may elect to purchase supplemental long-term disability coverage so that the total long-term disability Benefit under this Article 4 equals 67% of the Participant's Total Pay.  Supplemental coverage can be purchased only during the annual enrollment period while the Participant is actively at work and not receiving short-term disability Benefits under Article 3.  Such supplemental long-term disability coverage shall be subject to pre-existing condition limitations as established from time to time by the Claims Administrator. Each Participant who elects to purchase supplemental long-term disability coverage shall be required to pay a premium on an after-tax basis per $1,000 of coverage as determined by the Benefits Committee.

4.4     Benefit Limitation for Substance Abuse.

(a)     If a Participant is Disabled because of alcohol, drug or substance abuse or dependency, long-term disability Benefits under this Article 4 are payable for only (1) period of Disability during the Participant's lifetime.  In addition, the Participant must be participating in an available rehabilitation program recommended by a Physician.  An available rehabilitation program is a program available to the Participant through either another plan maintained by the Company or services generally available to the public through local community services at no or minimal cost to the Participant.

(b)     Benefits under Article 4 and this Section 4.4 shall cease on the earliest to occur of:

(i)     the date the Participant has received twenty-four (24) months of long-term disability Benefits;

(ii)     the date the Participant is no longer participating in an available rehabilitation program;

(iii)     the date the Participant refuses to participate in an available rehabilitation program; or

9

(iv)     the date the Participant completes the available rehabilitation program.

4.5     Survivor Benefits.

(a)     If a Participant dies while receiving long-term disability Benefits under this Plan, the Participant's spouse or unmarried children under age 25 may be eligible for a lump sum survivor benefit.

(b)     The amount of the survivor benefit equals three times the amount of the Participant's monthly long-term disability Benefit determined under Section 3.2. The survivor benefit is subject to reduction for any Benefits that the Claims Administrator determines have been erroneously paid to the Participant.

(c)     The survivor benefit (if any) is payable to the Participant's "Eligible Survivor" if the following conditions are met:

(i)     the Participant has completed his/her short-term period;

(ii)     the Participant is eligible to receive a monthly long-term disability Benefit under this Article 4 at the time of his/her death.

(iii)     the Participant has an eligible survivor; and

(iv)     proof of the Participant's death is provided to the Claims Administrator.

An "Eligible Survivor" is one of the following:

(i)     the Participant's surviving spouse; or

(ii)     if there is no surviving spouse, the Participant's unmarried children or the Participant's spouse's unmarried children under age 25. Eligible children also include adopted children and children placed for adoption until legal adoption. Payment will be divided into equal shares among the eligible children.

(d)     The survivor benefit will be paid to the Participant's Eligible Survivor on the date that is one month after the last monthly long-term disability Benefit payment was made before the Participant's death if the Claims Administrator is notified in a timely manner. If there is no Eligible Survivor on the date payment is due to be paid, no survivor benefit will be paid.

(e)     Payment to a minor child may be made to an adult who submits proof satisfactory to the Claims Administrator that he/she has assumed custody and support of the child.

4.6     Medical Examination.

(a)     A Physician appointed by the Employer or by the Claims Administrator may require that a Participant have a medical examination before receiving or continuing to

10

receive long-term disability Benefits under this Article 4. If such Physician disagrees with the Participant's Physician regarding whether the Participant is Disabled, the Employer or Claims Administrator shall appoint a third Physician to render an objective final decision relating to such examination.

(b)    An Employer or the Claims Administrator may at intervals of six months after a determination that the Participant is Disabled (or more frequently if the Employer or Claims Administrator has reason to believe that the Participant is no longer Disabled) request as a condition of receiving additional Benefits that the Participant have another medical examination. If the Physician appointed by the Employer or by the Claims Administrator disagrees with the Participant's Physician regarding whether the Participant is Disabled, the Employer or Claims Administrator shall appoint a third Physician to render an objective final decision relating to such examination.

4.7    Payment of Benefits. Benefits shall be paid from the Novartis Pharmaceuticals Corporation Employee Benefits Trust. Benefits will be paid to Participants on a monthly basis.

4.8    Non-duplication of Benefits. If a Participant become eligible for or begins receiving disability benefits in additional to the Benefits under this Article 4, Benefits under this Article 4 will be reduced, but not below zero, by the benefit the Participant receives, or becomes eligible to receive, from another source. Other sources of disability benefits include, but are not limited to, workers' compensation, Social Security, federal or state disability benefits, defined benefit pension benefits (even if paid as a lump sum), no fault automobile laws or insurance policies and payment for lost wages from a Third Party (including but not limited to any related payments from any federal or state government or agency).

4.9    Reemployment. If a Participant receiving long-term disability Benefits under this Article 4 is rehired for full-time employment at an Employer and becomes Disabled again, the Participant's Benefits will be determined as follows:

(a)    If the Participant becomes Disabled within 180 working days, and the Participant's subsequent Disability is the same Disability, the Participant will again be eligible to receive long-term disability Benefits under this Article 4.

(b)    If the Participant becomes Disabled after 180 working days, and the Participant's subsequent Disability is the same Disability, the subsequent Disability shall be treated as a new Disability and the Participant shall be eligible for short-term disability Benefits under Article 3.

(c)    If the Participant returns to work for any period of time and the subsequent Disability is a different Disability, the Participant's Disability shall be treated as a new Disability and the Participant shall be eligible for short-term disability Benefits under Article 3.

4.10    Rehabilitation Program. Under certain circumstances, a Participant may be able to work while receiving long-term disability Benefits under this Article 4. The Claims Administrator will contact those Participants who are potential candidates for the rehabilitation program. If a Participant who has been contacted by the Claims Administrator does not

11

cooperate with the Claims Administrator with respect to such rehabilitation program, he/she will cease to be eligible to receive long-term disability Benefits.

4.11    Cessation of Benefits.    A Participant's long-term disability Benefits under this Article 4 end on the first to occur of:

(a)    The Participant is no longer Disabled;

(b)    The Participant has received twenty-four (24) months of long-term disability Benefits if the Participant is Disabled because of a Mental or Nervous Disorder or Disease, unless the Disability resulted from schizophrenia, bipolar disorder, dementia or organic brain disease.

(c)    The Participant has received twenty-four (24) months of long-term disability Benefits if the Participant is Disabled because of soft tissue or neuromusculoskeletal conditions.

(d)    The Participant's Benefits cease under Section 4.4

(e)    The Participant reaches age 65 (or when the Participant has been receiving long-term disability Benefits for five years if the Participant became Disabled after attaining age 60);

(f)    The Participant becomes employed by any employer for wages, except if the Participant is eligible for rehabilitation program under Section 4.8; or

(g)    The Participant is eligible for the rehabilitation program under Section 4.8 and fails to cooperate with the Claims Administrator with respect to such program;

(h)    the date the Claims Administrator determines that the Participant has stopped receiving reasonable and appropriate medical treatment for his/her Disability;

(i)    the date the Claims Administrator determines that the Participant has stopped cooperating with the rehabilitation program;

(j)    the date the Claims Administrator determines the Participant refused to cooperate when referred for an independent medical examination

(k)    the date the Participant (or his/her Physician) refuses to supply information requested by the Claims Administrator;

(l)    the day before the Participant retires or voluntarily resigns from the Employer; or

(m)    The Participant dies.

12

## ARTICLE 5

### Plan Administration

     5.1   <u>Administration of Plan</u>.  The Plan shall be administered by the Plan Administrator.  The Committee shall be the Plan Administrator unless the Board of Directors of the Company or the Committee designates another party to act as Plan Administrator.  If another party is so designated, it shall acknowledge in writing that it is a fiduciary with respect to the Plan.  The Plan Administrator shall have authority to control and manage the operation and administration of the Plan including all rights and powers necessary or convenient to the carrying out of its functions hereunder, whether or not such rights and powers are specifically enumerated herein.  Without limiting the generality of the foregoing, and in addition to the other powers set forth in the Plan, the Plan Administrator shall have the following express discretionary authorities:

          (a)    to construe and interpret the terms of the Plan, and to resolve all ambiguities, inconsistencies or omissions therein;

          (b)    to decide all questions of eligibility and determine the amount, manner and time of payment of any benefits hereunder;

          (c)    to prescribe procedures to be followed by Participants with respect to benefit requests, elections, or benefit claims under the Plan;

          (d)    to prepare and distribute, in such manner as determined to be appropriate, information explaining the Plan;

          (e)    to receive or request from the Employers, Participants and beneficiaries such information as shall be necessary for the proper administration of the Plan;

          (f)    to furnish the Employers upon request such annual and other reports with respect to the administration of the Plan as are reasonable and appropriate;

          (g)    to reduce the amount of Participants' contributions and/or Benefits in order to satisfy any non-discrimination tests imposed by the Code;

          (h)    to determine the amounts available to provide a Benefit and to administer the claims procedure;

          (i)    to delegate authority with regard to its responsibilities hereunder to any individual, officer, insurance carrier or committee, including authority to subdelegate;

          (j)    to appoint or employ an administrator for the Plan and any other agents it deems advisable, including accountants, investment advisors and legal counsel who may or may not also be employed by the Company or an Employer; and

          (k)    to appoint or name a Claims Administrator to handle the administration of claims.

CHICAGO/#564019.3

5.2    <u>Rules and Procedures</u>.  The Plan Administrator may adopt such rules, regulations and bylaws as it deems necessary or desirable.

5.3    <u>Claims Procedure</u>.

(a)    Any Participant who believes that he/she is entitled to a Benefit under the Plan in an amount greater than he/she has received may file a claim for such benefit by writing to the Plan Administrator or Claims Administrator.

(b)    Every claim that is properly filed shall be answered in writing within forty-five (45) days (or one hundred twenty (120) days if special circumstances require an extension of time for processing the claim) of receipt stating whether the claim is granted or denied.  The timeframe can be extended by two thirty (30)-day periods.  If special circumstances require an extension of time for processing the claim, then the claimant shall be so notified within forty-five (45) days (or before the end of the first thirty (30)-day period if a second thirty (30)-day extension is needed).  If the claim is denied, the claimant shall be provided specific reasons for denial; specific reference to the pertinent Plan provisions on which the denial is based; a description of any information necessary for the claimant to perfect a claim including an explanation of why such information is necessary; and an explanation of the Plan's claim appeal procedure including steps to be taken to submit the claim for review.

(c)    Within one hundred eighty (180) days after notice that a claim is denied, the claimant may file a written appeal to the Committee that shall include any comments, statements or documents the claimant may wish to provide.  Notice of the decision on appeal shall be sent to the claimant within forty-five (45) days of its receipt (or one hundred ninety (90) days if special circumstances require an extension of time for processing the appeal).  In the event the claim is denied upon appeal, the Notice shall set forth the reasons for denial written in a manner calculated to be understood by the claimant and specific reference to the pertinent provisions of the Plan on which the denial is based.  Any reasonable request from a claimant for documents or information relevant to his claim prior to his filing an appeal shall also be allowed.

(d)    If notice of the denial of the claim or appeal is not furnished in the time limits set forth above, the claim or appeal shall be deemed denied.

5.4    <u>Actions of the Plan Administrator</u>.  All determinations, interpretations, rules, and decisions of the Plan Administrator or its delegate shall be conclusive and binding upon all persons having or claiming to have any interest or right under the Plan.

5.5    <u>Delegation</u>.  The Plan Administrator shall have the power to delegate specific duties, discretionary and other authorities and responsibilities to officers or employees of the Company or other individuals or entities.  Any delegation by the Plan Administrator may allow further delegations by the individual or entity to whom the delegation is made.  Any delegation may be rescinded by the Plan Administrator at any time.  Each person or entity to whom a duty or responsibility has been delegated shall be responsible for the exercise of such duty or responsibility and shall not be responsible for any act or failure to act of any other person or entity.

14

5.6    Reliance on Experts. The Plan Administrator and its delegates shall be entitled to rely on any and all schedules, valuations, certificates, reports, opinions or advice furnished by any duly appointed actuary, accountant, legal counsel, physician or other medical expert and any other duly appointed advisor. Any such advisor may be a person, firm or other organization acting or employed in like capacity for the Company or an Employer.

5.7    Reports and Records. The Committee and those to whom the Committee has delegated duties under the Plan shall keep records of all their proceedings and actions and shall maintain books of account, records, and other data as shall be necessary for the proper administration of the Plan in compliance with applicable law.

5.8    Finances. The costs of the Plan shall be borne as provided herein.

CHICAGO/#564019.3

ARTICLE 6

Funding and Contributions

6.1     Funding.  All costs of the Plan, including Plan benefits and Plan administrative expenses shall be paid by the Employer.

6.2     Participant Contributions.   The Employer shall designate the amount of Participant contributions required for Plan participation.  Such contributions shall be specified in Schedule A, which is hereby incorporated by reference in this Plan.  The Employer may change these amounts at its discretion.

CHICAGO/#564019.3

## ARTICLE 7

### Amendment and Termination of the Plan

7.1     <u>Amendment and Termination</u>.   The Plan may be amended or terminated at any time or from time to time by the Board of Directors of Novartis Pharmaceuticals Corporation. However, no such amendment or termination shall diminish or eliminate any claim for a benefit under the Plan to which a Participant shall have become entitled prior to such amendment or termination, as applicable.

17

ARTICLE 8

Miscellaneous

8.1    Applicable Law.  This Plan shall be interpreted, construed, and administered in accordance with the laws of the State of New Jersey to the extent such laws are not preempted by the laws of the United States.

8.2    Status of Employment Relations.  The adoption and maintenance of this Plan shall not be deemed to constitute a contract between the Employer and any employees or to be consideration for, or an inducement or condition of, the employment of an employee.  Nothing in this Plan shall be deemed:

(a)    to affect the right of the Employer to discipline or discharge any employee at any time;

(b)    to affect the right of any employee to terminate his employment at any time;

(c)    to give the employer the right to require any employee to remain in its employ; or

(d)    to give to any employee the right to be retained in the employ of the Employer.

8.3    Number and Gender.  Whenever words are used in this Plan in the singular or masculine form, they shall, where appropriate, be construed so as to include the plural, feminine, or neuter form.

8.4    Captions.  Captions of the Plan are inserted for convenience of reference only, and the Plan is not to be construed by interpretation thereof.

8.5    Facility of Payments.  In the event that the Plan Administrator shall find that any Participant to whom an amount is payable under the Plan is unable to care for his affairs because of illness or accident or, otherwise, the Plan Administrator may direct that any payment due shall be paid to the duly appointed legal representative of such person or if there be no duly appointed legal representative, to the spouse, a child, a parent or other blood relative of the person or to any person deemed by the Plan Administrator to have incurred expense for the benefit of such person, and any such payments so made shall be a complete discharge of the liabilities of the Plan therefore.

8.6    Severability of Provisions.  If any provision of this Plan shall be invalidated by a court of competent jurisdiction, such invalidity shall affect that provision only and not the entire Plan.  The Plan shall be construed and enforced, in the affected jurisdiction, as if the invalidated provision had never been a part of the Plan.

8.7    No Assignment of Benefits.  No Benefit under the Plan, nor any other interest hereunder of any Participant shall be assignable, transferable, or subject to sale, mortgage, pledge, hypothecation, commutation, anticipation, garnishment, attachment, execution, or levy of

18

CHICAGO/#564019.3

any kind, and the Plan Administrator shall not recognize any attempt to assign, transfer, sell, mortgage, pledge, hypothecate, commute, or anticipate the same.

8.8　　Subrogation, Reimbursement, and Recovery for Third Party Liability Expenses. As a condition for receiving benefits under the Plan, each Participant agrees to and grants the Plan the right of subrogation, the right of reimbursement, and the right of recovery, as set forth herein.

(a)　　Exclusion of Coverage for Disabilities Caused by a Third Party. The Plan does not cover Disabilities incurred as a result of the actions of a Third Party who is or may be liable for all or part of such expenses. This exclusion from coverage also extends to claims due to Disability to the extent that payment is or may be made under the terms of any "no-fault" type of automobile policy, an uninsured or underinsured motorist coverage under an automobile policy, any homeowner's policy, workers' compensation, or other similar insurance coverage.

(b)　　Right of Subrogation. Whether or not a Participant executes a reimbursement agreement, the Participant agrees as a condition to participation in or the receipt of benefits under the Plan that the Plan shall have the right of subrogation with respect to the full amount of benefits paid to or on behalf of a Participant as the result of a Disability that is or may be the responsibility of any Third Party. The Plan shall also have a lien upon any recovery from such Third Party to the full amount of benefits paid and may, at its option, file suit or intervene in any pending lawsuit to secure and protect its rights. The Plan's right of subrogation shall apply to the first dollar of any recovery obtained from the Third Party, even if the recovery obtained is less than the amount needed to make whole the Participant.

(c)　　Reimbursement Agreement. If a Participant incurs a Disability that is excluded in accordance with this provision of the Plan because it is or may be the responsibility of a Third Party, the Participant will be required, as a prerequisite to receiving Benefits, to sign a reimbursement agreement in a form acceptable to the Plan Administrator acknowledging the Participant's obligation to reimburse the Plan for any Benefits paid by the Plan from the first dollars recovered from any source. The Plan Administrator may, in its discretion, withhold benefit payments that might otherwise be advanced, and/or prosecute an action at law or in equity in its own name or in the name of the Participant, in order to enforce, secure, or protect the Plan's rights under this provision. If the Participant elects not to execute such an agreement, the Plan is not obligated to provide any Benefit payments.

(d)　　Right of Reimbursement. Whether or not a Participant executes a reimbursement agreement, in the event that the Plan provides Benefits to a Participant and the Participant recovers a payment, either by settlement, judgment, no-fault automobile insurance statute, or otherwise, from any Third Party or other source, then the Participant shall immediately reimburse the Plan for the full amount of any and all benefits paid in connection with such injury, illness, disability or death, up to the amount of the recovery. This right of reimbursement applies regardless of the label assigned to the recovery, and regardless of any purported allocation or itemization of such recovery to specific types of injuries. If the recovery is for damages other than for disability expenses, such as pain and suffering, the Participant will still be required to reimburse the Plan first. The Plan shall have a lien upon any such recovery in the amount of Benefits paid by the Plan. The Plan's right of reimbursement shall apply to the first

19

dollar of any recovery obtained from the Third Party, even if the recovery obtained is less than the amount needed to make the whole the Participant.

      (e)    <u>Duty to Cooperate</u>.  The Participant is required to cooperate fully with the Plan in connection with the exercise of its rights under this provision, to provide information, assistance and documents or other instruments as the Plan may require to facilitate the Plan's rights hereunder, and shall do nothing to prejudice such rights.  The Participant shall notify the Plan before filing any suit and shall not settle any claim against a Third Party without giving notice to and obtaining the consent of the Plan Administrator.  If the Participant notifies the Plan before suit or settlement, the Plan may retain the Participant's attorney to represent the Plan.  If the Plan hires the Participant's attorney, the Plan will agree with the attorney on the amount of attorneys' fees and expenses that the Plan will pay.  The Plan is not bound by the amount or percent of the Participant's attorneys' fees, nor may the Participant subtract them from what is repaid to the Plan without the Plan's consent.

      (f)    <u>Right of Recovery or Offset</u>.  The Plan shall have the right to withhold the payment of Benefits under this Plan if a Participant has breached his/her obligations under this provision, and shall have the right to recover any Benefits erroneously paid to a Participant.  The Plan may cease to advance payment of Benefits under a reimbursement agreement if, in the discretion of the Plan Administrator, the Participant has failed or is failing to fulfill his/her duty to cooperate.  These rights are in addition to any other rights and remedies that the Plan may have.

      Executed this ____ day of _____, 2006.

                    NOVARTIS PHARMACEUTICALS
                    CORPORATION

                    By:_____